Nos. 68,040 and 68,044

CYNTHIA SCOTT LARSON and CURTIS GRAHAM, *Appellees,* v. JO-
SEPH RUSKOWITZ and WYANDOTTE COUNTY BOARD OF COM-
MISSIONERS, *Appellants.*

(850 P.2d 253)

Opinion filed April 16, 1993.

*R. Jeff Fendorf*, assistant county counselor, argued the cause and was on the brief for appellants.

*Jeffrey A. Dehon*, of Kansas City, argued the cause and was on the brief for appellees.

The opinion of the court was delivered by

McFARLAND, J.: These are consolidated retaliatory discharge actions in which the plaintiffs contend their terminations as supervisors with Wyandotte County Community Corrections resulted from their comments criticizing the operation of the agency by its director, Joseph Ruskowitz. Verdicts were entered in favor of the plaintiffs, as follows:

Larson:

| | |
|---|---|
| Lost wages and benefits | $100,000.00 |
| Emotional distress | $200,000.00 |
| Total | $300,000.00 |

Graham:

| | |
|---|---|
| Lost wages and benefits | $360,000.00 |
| Emotional distress | $140,000.00 |
| Total | $500,000.00 |

The defendants appeal therefrom.

## JURISDICTION

For their first issue on appeal, the defendants contend the district court lacked subject matter jurisdiction herein. Their argument is as follows. On September 28, 1990, the plaintiffs were advised that they would be laid off effective October 31, 1990. The plaintiffs, in accordance with Wyandotte County's grievance

procedures, filed grievances protesting their layoffs to the defendant Board of County Commissioners (Board), and the Board upheld the layoffs on October 30, 1990. The plaintiffs then followed the procedures set forth in K.S.A. 12-105b for filing claims for actions under the Kansas Tort Claims Act (K.S.A. 75-6101 *et seq.*).

The defendants contend the proper procedure was for the plaintiffs to have appealed the decision of the Board affirming the layoffs to the district court under K.S.A. 19-223, which provides:

"Any person who shall be aggrieved by any decision of the board of commissioners may appeal from the decision of such board to the district court of the same county, by causing a written notice of such appeal to be served on the clerk of such board within thirty days after the making of such decision, and executing a bond to such county with sufficient security, to be approved by the clerk of said board, conditioned for the faithful prosecution of such appeal, and the payment of all costs that shall be adjudged against the appellant."

The defendants acknowledge that this issue is being raised for the first time on appeal. The defendants argue that lack of jurisdiction may be raised at any time and that reviewing courts have a duty to raise the issue *sua sponte*, citing *Misco Industries, Inc. v. Board of Sedgwick County Comm'rs*, 235 Kan. 958, 685 P.2d 866 (1984), and *Dick v. Drainage District No. 2*, 187 Kan. 520, 358 P.2d 744 (1961).

Inasmuch as this issue is a challenge to jurisdiction, we will consider the issue, although it is raised for the first time on appeal.

In *Dutoit v. Board of Johnson County Comm'rs*, 233 Kan. 995, 998-99, 667 P.2d 879 (1983), we discussed K.S.A. 19-223 and held that it provided the exclusive method by which a district court may review a judicial or quasi-judicial decision of a board of county commissioners but was inapplicable to appeals from a legislative-type decision by a board of county commissioners.

What type of decision is involved herein? In September 1990, the Board had approved a reorganization plan submitted to it by the Community Corrections Advisory Board which provided, *inter alia*, for the elimination of 15 positions including the two held by the plaintiffs. In the filing of the grievances, the plaintiffs were, in essence, asking the Board to reconsider that aspect of

the reorganization plan which eliminated their positions. When their efforts at retention of their employment proved unsuccessful, they then brought this action in tort seeking damages for their termination after filing the necessary statutory notice.

We conclude this was an appropriate procedure. The action herein arises out of the employer-employee relationship of the parties. The Board was acting in an administrative capacity in approving the reorganization plan and in declining to modify the plan as requested by the plaintiffs. The tort action herein could have been brought without having sought reconsideration of the reorganization plan. The fact that such reconsideration or review was sought does not lock plaintiffs into a position of being required to exhaust that avenue through the court system in lieu of or as a condition to proceeding under the Tort Claims Act. We conclude the district court had jurisdiction herein.

## CAUSE OF ACTION

For their second issue, the defendants contend the case was improperly submitted to the jury. They argue that the district court either failed to make or improperly made certain necessary determinations required by the nature of the cause of action. These areas involve determination of whether the statements of the plaintiffs which they contend caused their discharge involved a matter of public concern and application of the balancing test. Before proceeding to a discussion of the facts herein and how the case was judicially handled, an analysis of the cause of action is appropriate.

In their briefs the parties refer to the case as being a "whistle-blowing" retaliatory discharge claim. In their briefs the parties treat two related causes of action which differ in significant respects as one, and this blending has, we believe, caused some of the problems present herein. We need to discuss and separate these two causes of action.

*Palmer v. Brown*, 242 Kan. 893, 752 P.2d 685 (1988), is a good example of a "whistle-blowing" retaliatory discharge action. In *Palmer*, the plaintiff was a medical technician employed in a laboratory owned by the defendants. Although not directly involved therein, she became aware of the fact that the laboratory was committing Medicaid fraud by billing for tests that were not

performed. She reported this fact to "unspecified authorities" and was terminated from her employment for such action.

In *Palmer*, we noted that it is public policy to encourage citizens to report crimes and that Medicaid fraud is a felony offense, and we traced the development of retaliatory discharge actions based upon "whistle-blowing." We then stated:

"Several jurisdictions have provided common-law 'whistle-blower' protection for employees discharged for reporting illegal activity. See, *e.g.*, *Vermillion v. AAA Pro Moving & Storage*, 146 Ariz. 215, 704 P.2d 1360 (1985) (employee told customer of employer theft of customer's property); *Palmateer v. International Harvester Co.*, 85 Ill. 2d 124, 421 N.E.2d 876 (1981) (employee reported to police theft of screwdriver by co-employee); *Kalman v. Grand Union Co.*, 183 N.J. Super. 153, 443 A.2d 728 (1982) (pharmacist reported to State Board of Pharmacy employer's plan to violate state pharmacy rules); *Garibaldi v. Lucky Food Stores, Inc.*, 726 F.2d 1367 (9th Cir. 1984) (employee reported to California health officials shipment of adulterated milk); *Shaw v. Russell Trucking Line, Inc.*, 542 F. Supp. 776 (W.D. Pa. 1982) (employee notified police that employer's trucks were overloaded in violation of state law).

"Public policy requires that citizens in a democracy be protected from reprisals for performing their civic duty of reporting infractions of rules, regulations, or the law pertaining to public health, safety, and the general welfare. Thus, we have no hesitation in holding termination of an employee in retaliation for the good faith reporting of a serious infraction of such rules, regulations, or the law by a co-worker or an employer to either company management or law enforcement officials (whistle-blowing) is an actionable tort. To maintain such action, an employee has the burden of proving by clear and convincing evidence, under the facts of the case, a reasonably prudent person would have concluded the employee's co-worker or employer was engaged in activities in violation of rules, regulations, or the law pertaining to public health, safety, and the general welfare; the employer had knowledge of the employee's reporting of such violation prior to discharge of the employee; and the employee was discharged in retaliation for making the report. However, the whistle-blowing must have been done out of a good faith concern over the wrongful activity reported rather than from a corrupt motive such as malice, spite, jealousy or personal gain." 242 Kan. at 900.

Significantly, there is no mention in *Palmer* of the First Amendment determination that the employee's communication was a matter of "public concern," or utilization of a balancing test. Justification for the "whistle-blowing" cause of action is the public policy of encouraging employees to do their duty as citizens and report violations pertaining to public health, safety, and general

welfare. The same public policy extends to all employees—whether in the public or private sector. Not to denigrate such cause of action but to assist in differentiating it from the related cause of action, we might characterize the whistle-blowing form of retaliatory discharge cases as involving employees who inform or "snitch" on the employers' violations of laws or regulations out of the pure motivation of good citizenship. Public policy requires that such persons be protected from being discharged for their acts. No protection is afforded employees who blow the whistle or inform out of corrupt motive, personal gain, spite, malice, etc.

Congress has enacted legislation, commonly known as the "Whistle-Blowers Protection Act" (5 U.S.C. § 1201 *et seq.* [1988]), which protects federal employees who have disclosed information they believe evidences:

"(A) a violation of any law, rule, or regulation; or
(B) gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety;
if such disclosure is not specifically prohibited by law and if such information is not specifically required by Executive order to be kept secret in the interest of national defense or the conduct of foreign affairs." 5 U.S.C. § 1213 (Supp. III 1991).

Actions by employees-at-will based upon retaliatory discharge for having filed workers compensation claims are recognized in Kansas. *Cox v. United Technologies*, 240 Kan. 95, 727 P.2d 456 (1986); *Murphy v. City of Topeka*, 6 Kan. App. 2d 488, 630 P.2d 186 (1981). As in retaliatory discharge actions based upon whistle-blowing, the rationale for allowing such claims is public policy. Also, as in whistle-blowing cases, employees in both the public and private sectors are protected.

This brings us to the type of retaliatory discharge action with which whistle-blowing has been confused herein—the discharge of a public employee for having exercised his or her right of freedom of speech as guaranteed by the First Amendment to the United States Constitution. Illustrative of such cause of action and the requirements therefor is *Riddle v. City of Ottawa*, 12 Kan. App. 2d 714, 754 P.2d 465, *rev. denied* 243 Kan. 780 (1988). A good summary of the applicable law is set forth therein, although the reference to *Palmer v. Brown*, 242 Kan. 893, (the

whistle-blowing case) should have identified it as such. We quote the following with approval:

"Riddle alleged he was suspended for ten days without pay because he sent a letter to the City Commission outlining his grievances with the Department of Public Safety. This letter was allegedly sent at the request of a city commissioner, and evidence is in the record that the city manager also solicited grievances. The law has been clear ever since *Pickering v. Board of Education*, 391 U.S. 563, 20 L. Ed. 2d 811, 88 S. Ct. 1731 (1968), that a state cannot dismiss a public employee for exercising his or her right to speak out on issues of public concern. To allow a governmental unit to discharge a person because of his or her constitutionally protected speech would have an inhibiting effect on the exercise of that freedom. See *Perry v. Sindermann*, 408 U.S. at 597. To allow a governmental unit to suspend a public employee without pay for exercising his or her right to speak on matters of public concern would have the same inhibiting effect. When a reasonably prudent person concludes that a co-worker or employer is engaged in activities in violation of rules, regulations, or the law pertaining to public health, safety, and the general welfare, the public policy of this state that an employee reporting such violation be free from retaliation is involved. *Palmer v. Brown*, 242 Kan. 893, Syl. ¶¶ 1, 3, 752 P.2d 685 (1988).

"However, a public employee's right to free speech is not absolute. '[T]he State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general.' There should be a balance between the interests of a public employee, as a citizen, 'in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.' *Pickering*, 391 U.S. at 568.

"In *Connick v. Myers*, 461 U.S. 138, 75 L. Ed. 2d 708, 103 S. Ct. 1684 (1983), the United States Supreme Court expounded on the correct analysis to be applied to cases such as the one at bar. The first inquiry is whether Riddle's letter can be fairly characterized as constituting speech on a matter of public concern. If it cannot be, it is unnecessary for this court to scrutinize the reason for his discharge. See *Connick*, 461 U.S. at 146. 'Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record.' *Connick*, 461 U.S. at 147-48. The question is one of law, not fact.

"If a public employee's speech can be characterized as addressing a matter of public concern, it is the court's responsibility to then balance the interest of the employee with the interest of the State in effectively and efficiently fulfilling its responsibilities to the public. One relevant inquiry is whether the action disrupted or undermined working relationships in the department. Also relevant is the manner, time, and place in which the letter was sent and whether this had a disruptive effect on the department or undermined the director's authority. If this balance tips in favor of the employee, the

employee still has the burden of showing that the letter was a motivating factor for his or her suspension. *Mt. Healthy City Board of Ed. v. Doyle*, 429 U.S. 274, 287, 50 L. Ed. 2d 471, 97 S. Ct. 568 (1977). If Riddle meets this burden, then the burden shifts to the City to show, by a preponderance of the evidence, that it would have reached the same decision to suspend Riddle even in the absence of the communication. For the same proposition, see *Rankin v. McPherson*, 483 U.S. 378, 97 L. Ed. 2d 315, 324-29, 107 S. Ct. 2891 (1987); *Polson v. Davis*, 635 F. Supp. 1130, 1137 (D. Kan. 1986).

"The trial court found that the letter Riddle sent to the City Commission did not address a matter of public concern, but was a mere expression of his personal grievances. '[A]ppellate review of conclusions of law is unlimited.' *Utility Trailers of Wichita, Inc. v. Citizens Nat'l Bank & Tr. Co.*, 11 Kan. App. 2d 421, 423, 726 P.2d 282 (1986).

"A review of the letter Riddle sent to the City Commission shows that the majority of the letter addressed only his personal grievances. However, the letter did address at least one matter of public concern: that the fire trucks had to have a battery charger kept on them so they would start, despite the fact the batteries were new, because the radio system was a constant drain on the batteries. The community has a significant interest in knowing whether its fire department can respond quickly and efficiently in an emergency.

"In *Connick v. Myers*, 461 U.S. 138, an assistant district attorney in New Orleans was discharged after distributing a questionnaire soliciting the views of her fellow staff members about certain concerns she had about the office. The attorney filed suit under 42 U.S.C. § 1983, contending her employment was wrongfully terminated because she had exercised her constitutionally protected right of free speech. The United States Supreme Court applied the relevant analysis to the facts in *Connick*, and found that, *with but one exception*, the questionnaire did not address matters of public concern.

"The United States Supreme Court went on to say, however, that because *one of the questions* in the survey *did touch upon a matter of public concern and contributed to her discharge*, the court had to determine whether the district attorney was justified in discharging his subordinate. The court applied the balancing test enunciated in *Pickering* and found that there was no demonstration the questionnaire impeded the assistant district attorney's ability to perform her responsibilities. However, the court found that the questionnaire did disrupt the office and undermined office relationships. 'When close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate.' *Connick*, 461 U.S. at 151-52. The Court also considered the time, place, and manner in which the questionnaire was distributed and found these factors to tip the balance in favor of the employer. The Supreme Court held the assistant district attorney's being discharged did not offend the First Amendment.

"The point of *Connick* is that, even though the majority of the questionnaire in that case, like the majority of the letter in the present case, did

not address matters of public concern, the questionnaire, like the letter, did address *one* matter of public concern, causing the United States Supreme Court to apply the remainder of the *Pickering* balancing test. The trial court in the present case did not apply the balancing test, having initially determined that the threshold question, *i.e.*, whether the letter addressed a matter of public concern, should be answered in the negative. Since the letter did address at least *one* matter of public concern, *Connick* mandates that the remainder of the balancing test be applied in the present case." 12 Kan. App. 2d at 719-22.

*Riddle* was then remanded with directions to reconsider the First Amendment issue.

Some additional portions of *Connick v. Myers*, 461 U.S. 138, 75 L. Ed. 2d 708, 103 S. Ct. 1684 (1983), are illuminative and are set forth as follows:

"To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark—and certainly every criticism directed at a public official—would plant the seed of a constitutional case. While as a matter of good judgment, public officials should be receptive to constructive criticism offered by their employees, the First Amendment does not require a public office to be run as a round-table for employee complaints over internal office affairs.

. . . .

"The *Pickering* balance requires full consideration of the government's interest in the effective and efficient fulfillment of its responsibilities to the public. One hundred years ago, the Court noted the government's legitimate purpose in 'promot[ing] efficiency and integrity in the discharge of official duties, and [in] maintain[ing] proper discipline in the public service.' *Ex parte Curtis*, 106 U.S., at 373. As JUSTICE POWELL explained in his separate opinion in *Arnett v. Kennedy*, 416 U.S. 134, 168 (1974):

" 'To this end, the Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs. This includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch. Prolonged retention of a disruptive or otherwise unsatisfactory employee can adversely affect discipline and morale in the work place, foster disharmony, and ultimately impair the efficiency of an office or agency.' " 461 U.S. at 149-51.

We turn now to the facts in the case before us.

The Wyandotte County Community Corrections program operates under the auspices of the Community Corrections Act (K.S.A. 75-5290 *et seq.*). The operation of the program is funded by grants from the Secretary of Corrections, who establishes rules and regulations for such programs. Each participating county has to submit an operating plan to the Secretary and gain his or her

approval thereof. Payment of grant monies may be suspended if the county is not in substantial compliance with the Secretary's minimum operating standards (K.S.A. 75-5296). A Corrections Advisory Board for Wyandotte County was established under K.S.A. 75-5297. The advisory board makes recommendations to the board of county commissioners, the latter being the body politic charged with operating the program.

Joseph Ruskowitz was the director of the Wyandotte County Community Corrections program at all times pertinent herein. In approximately May 1990, he was advised by the Kansas Department of Corrections (KDOC) that he could expect a 22 percent reduction in funding the following year and that his authorized staff positions should be reduced from 43 to 28. Ruskowitz met with the advisory board and it was decided that rather than reduce staff positions, they would prefer to not fill four vacancies, eliminate one position, and reduce services to make up the anticipated shortfall. This solution was presented to the Board and approved by it and then by KDOC. Services such as drug testing and the drug treatment program were eliminated. Additionally, salaries were frozen and probation officers' reimbursements for mileage were eliminated. The employees were concerned about their future and the budgetary restraints imposed. Word of this reached the Board, which sent the county personnel director to talk to two groups of employees—supervisors and nonsupervisory employees. The plaintiffs and one other supervisor were present at the meeting held August 14, 1990. The county personnel director's notes reflect the following was mentioned (without reference to who said what):

"Poor leadership and gross mismanagement of funds are reasons for the problems at Community Corrections.
"Morale has been torn down.
"There have been unfair hiring practices, promotions and disciplinary actions.
"Accusations made concerning misuse of funds.
"Many good people leaving the organization.
"There is money in the budget to operate program if it is spent wisely."

The mismanagement of funds comments were not relayed to the county commissioners as the personnel officers felt the comments to be unsubstantiated. Two days later, an article appeared

in a local newspaper, headlined "County corrections director at odds with employees, state." The article mentioned the budget cuts and reductions in services. It went on to state several agency employees had been interviewed and that most wanted to remain anonymous "for fear of reprisals." The employees were said to have been very concerned over the reduction in services and loss of mileage reimbursements. They were critical of the decision to cut services rather than people. Ruskowitz's style of management was criticized. Neither plaintiff was quoted by name in the article, but both stated they did talk to the reporter writing the article. The only employee quoted was Gwen Hedstrom.

In September 1990, a reorganization plan was submitted by Ruskowitz to the advisory board which, *inter alia*, eliminated the department performing presentence reports for the courts (this had been a bone of contention with KDOC as this work is performed by court employees in the other Kansas counties). The agency would still do the work, but the report would be added to the work assignment of existing probation-type officers. Also eliminated was the Community Services Department, which checked on how persons assigned to Community Corrections for supervision were getting along in their jobs. This function would be taken on by the probation-type officers. A total of 15 positions were eliminated—the two departments mentioned contained 7 of such positions. Plaintiff Larson was the supervisor of the .presentence investigation department and plaintiff Graham was the supervisor of the Community Services Department. The advisory board approved the plan and sent it to the Board. After the Board approved the same, it was sent to KDOC where approval was granted. Thereafter, the plaintiffs were advised they would be laid off in accordance with the plan effective October 31, 1990. These lawsuits resulted.

One of the immediate problems presented is precisely what comments can be ascribed to either or both of the plaintiffs. This is not necessarily a fatal flaw for, as the Court of Appeals held in *Pilcher v. Board of Wyandotte County Comm'rs*, 14 Kan. App. 2d 206, 787 P.2d 1204, *rev. denied* 246 Kan. 768 (1990), the cause of action will lie if the employer believed the plaintiff was the source of reported protected comments and was terminated for that reason.

However, overriding all is the fundamental error which permeates the entire action. In the district court's instructions, the following is stated as being the plaintiffs' case:

"INSTRUCTION NO. 7

"The plaintiffs contend they were wrongfully laid-off/discharged in retaliation for statements and comments they each made to a local newspaper, to the Wyandotte County Personnel Director, to Wyandotte County Commissioners, and to other agency employees regarding Joseph Ruskowitz's violation of rules and regulations pertaining to the general welfare and operation of the Wyandotte County Community Corrections Agency."

"INSTRUCTION NO. 9

"In order to maintain a claim based on the 'whistle-blowing' exception, the employee must prove that:

"(1) The employee's employer was engaged in conduct in violation of rules, regulations, or the law pertaining to public health, safety, and the general welfare;

"(2) The employer had knowledge of the employee's reporting of such violations prior to the discharge; and

"(3) The employee was discharged in retaliation for making the report."

The evidence in this case does not fit the scenario that the employer "was engaged in conduct in violation of rules, regulations, or the law pertaining to public health, safety, and the general welfare," or that the employees were discharged for reporting the violation as in *Palmer v. Brown*, 242 Kan. 893, 752 P.2d 685 (1988). No claim was made that Ruskowitz misappropriated funds or committed any criminal act. Laws, rules, or regulations concerning public health, safety, or general welfare are not involved in the claims herein. In short, this is not a whistle-blowing case. Thus, the public policy considerations underlying whistle-blowing cases are absent. Rather, any protection to be afforded plaintiffs must come through their First Amendment rights of freedom of speech as discussed in *Riddle v. City of Ottawa*, 12 Kan. App. 2d 714, 754 P.2d 465, *rev. denied* 243 Kan. 780 (1988), and cases cited therein, subject to the requisite threshold determinations previously discussed.

In this issue, the defendants argue the threshold requirement of establishing any of plaintiffs' speech was protected, *i.e.*, a matter of public concern, was not met herein and also that the district court erred in not making the threshold balancing test, if some speech was found to be protected. There is nothing in the record to indicate any threshold determinations were made

herein by the district court. There is also absent any indication the district court was requested to make any such determination. This latter point is troublesome.

There have been few cases in Kansas involving retaliatory discharge based upon statements made by employees. *Palmer* and *Riddle* involve the subject and follow divergent tracks as previously discussed. Neither attempts to differentiate between the legal requirements for a whistle-blowing action and a public employee's claim based upon the First Amendment as there were no issues in either requiring such a discussion. Under the totality of the circumstances herein, we believe that the interests of justice require that the judgments herein be reversed and that the cases be remanded for further proceedings consistent with retaliatory discharge actions based upon violation of public employees' First Amendment rights.

On remand, the district court is directed to make the requisite threshold determinations. This involves determining precisely what statements each of the plaintiffs made (or what the defendants believed they made). Such statements must then be judicially winnowed to determine if any are in the protected category—namely involving a matter of public concern. If any such statements are found to exist, the balancing test must be performed in which the protected speech is weighed against the employer's rights. In addition, in these cases there is the matter of the defendants' contentions that the plaintiffs were not laid off for what they said, but as the result of a reorganization mandated by the budget crunch created by KDOC. In making the threshold determinations, the totality of the circumstances must be considered.

## INSTRUCTIONS

The defendants claim numerous errors in the instructions. The complained-of instructions are essentially patterned after those appropriate to a whistle-blowing case. Nothing would be gained from an analysis thereof in light of our previous determination.

The judgment is reversed, and the case is remanded with directions for further proceedings consistent with this opinion.