(873 P.2d 199)
No. 68,818

CINDY S. DENNIS, *Appellee*, v. JOSEPH RUSKOWITZ and
WYANDOTTE COUNTY BOARD OF COMMISSIONERS, *Appellants*.
Petition for review denied 255 Kan. 515 (1994).

Opinion filed April 29, 1994. 

R. *Jeff Fendorf,* assistant county counselor, for the appellants.

R. *Bruce Kips,* of Fairway, for the appellee.

Before BRISCOE, C.J., GREEN, J., and GARY L. NAFZIGER, District Judge, assigned.

BRISCOE, C.J.: Joseph Ruskowitz and the Wyandotte County Board of County Commissioners (Board) appeal the trial court's denial of their motion for a directed verdict. Appellants contend Cindy Dennis failed to prove she was discharged in retaliation for "whistle-blowing."

Appellants contend Dennis failed to prove the basic elements of a claim for retaliatory discharge for whistle-blowing and, therefore, the court should have granted their motion for a directed verdict at the close of Dennis' evidence.

" 'In ruling on a motion for directed verdict pursuant to K.S.A. 60-250, the court is required to resolve all facts and inferences reasonably to be drawn from the evidence in favor of the party against whom the ruling is sought and where reasonable minds could reach different conclusions based on the evidence the motion must be denied and the matter submitted to the jury. This rule must also be applied when appellate review is sought on a motion for directed verdict.' " *Simon v. National Farmers Organization, Inc.,* 250 Kan. 676, 683, 829 P.2d 884 (1992) (quoting *Turner v. Halliburton Co.,* 240 Kan. 1, Syl. ¶ 1, 722 P.2d 1106 [1986]).

Dennis was a case manager for the Wyandotte County Community Corrections (Community Corrections) program from December 8, 1986, to February 2, 1990. Her supervisors during her employment for the approximate time periods indicated were: Pat Jackson from December 1986 to July 1987, Ed Zukel from July 1987 to July or August 1988, Scott Hutton from September 1988 to December 1988, Darryl Sjoblom from December 1988 to June 1989, and Evaristo Gaitan for the remainder of her em-

ployment. Ruskowitz was director of Community Corrections during the times relevant to this appeal.

In the fall of 1988, Dennis applied for a Case Manager II position, a supervisory position, but Sjoblom was placed in that position and became Dennis' supervisor. Dennis and others believed that Sjoblom was not as qualified as other applicants. Dennis interpreted Sjoblom's placement as sexual discrimination and filed an informal grievance dated December 9, 1988. On December 30, 1988, she filed a formal grievance. On January 5, 1989, the day Dennis received an acknowledgement of receipt of her informal grievance, she was reprimanded by Zukel for an incident that she did not believe merited a reprimand. Dennis then filed a complaint with the Equal Employment Opportunity Commission (EEOC) on January 11, 1989.

It is not clear exactly when Ruskowitz became aware of the EEOC complaint, but he did receive a copy from the EEOC. Correspondence from the EEOC indicates Ruskowitz would have received the document within 10 days after January 13, 1989. Ruskowitz also became aware at some point that Dennis had filed a complaint with the Kansas Civil Rights Commission.The EEOC and civil rights complaints were combined, but the complaints were later dismissed for lack of probable cause.

In addition to filing complaints and grievances, Dennis spoke with a newspaper reporter on January 13 or 14, 1989. This resulted in an article in a Kansas City newspaper on March 17, 1989, that reported there were delays in setting up programs at Community Corrections, too much money was spent in setting up the programs, and state funding might be lost if programs were not started soon. There was testimony that Ruskowitz believed Dennis was partly responsible for the newspaper article.

In May 1989, Dennis was involved in a confrontation with Ruskowitz concerning what Dennis perceived to be mismanagement and misappropriation by Ruskowitz of Community Corrections' social club funds. A vending machine company damaged a wall in the Community Corrections facility in April 1989, and an employee repaired the wall. The money paid by the vending company for repair of the wall, approximately $650, was deposited by Ruskowitz into the social fund. None of the money was used to repair the wall but, instead, the money was used to purchase

a TV/VCR and a microwave. There was testimony that the TV/VCR was allegedly to be used for training, although its small size may have prevented such use. There was confusing testimony about the microwave. It was apparently returned to the place of purchase, but it is unclear whether a cash refund was received.

Dennis did not approve of the money being deposited in the social fund account and used to purchase the TV/VCR and microwave. On May 2, 1989, she questioned Ruskowitz about the deposit and three blank checks he had obtained from Graham. The day after she confronted Ruskowitz, Dennis was informed that her name would be removed from the social fund account and she was also removed from the social club committee. The account was closed later that month due to a lack of interest in the social club. There was conflicting evidence regarding whether there was any money in the account when it was closed. Dennis stated there was $68.04 in the account, but Ruskowitz testified there was no money in the account. Dennis testified she was informed that Ruskowitz and Joe Connor, who replaced Dennis on the committee, split the $68.04 that remained.

According to Ruskowitz, the social fund was investigated by the Wyandotte County District Attorney's office after information regarding the fund became known by the Department of Corrections (Department) in Topeka. It is unclear from the evidence presented by Dennis how the Department obtained information regarding the social fund. It is also unclear when the investigation took place. However, the investigator who investigated the social fund testified that Dennis called the Department on January 31, 1990, alleging, among other things, that Ruskowitz had misappropriated the money received from the damaged wall. The district attorney's office became aware of these allegations on February 26, 1990. After an investigation into the allegations concerning the fund, the district attorney concluded there was no wrongdoing.

On February 23, 1989, about one month after she filed the EEOC complaint, Dennis' performance evaluation was the lowest rating within the "average" range. Her second evaluation, dated December 11, 1989, was unsatisfactory. Only the names of Hutton and Ruskowitz appeared on this evaluation, although Gaitan was her immediate supervisor at the time and, unlike Gaitan, Hutton

did not work with Dennis on a regular basis at that time. About six weeks later, on January 29, 1990, Dennis received her third and final evaluation, which also stated that her performance was unsatisfactory. This evaluation was signed by Ruskowitz and Hutton although, again, Gaitan was her immediate supervisor. During the approximately six weeks that elapsed between her second and third evaluations, Dennis took some vacation and sick leave and was off work because of the holidays.

In a letter dated January 29, 1990, Ruskowitz informed Dennis that he intended to terminate her effective February 2 for, among other things, her inefficiency and insubordination. A hearing was held at which Dennis argued her case, but her employment was terminated. Dennis' arguments included testimony that evaluations are usually performed annually, although her evaluations were less than a year apart, with the last two being six weeks apart. However, Ruskowitz testified evaluations were to be done annually, unless an employee's performance necessitated corrective action. Dennis also presented evidence to the effect that evaluations were generally given by an employee's direct supervisor, who at the time of her two final evaluations was Gaitan. Ruskowitz and Gaitan testified that the reason Gaitan did not evaluate Dennis was because he was new and in a probationary period. However, Gaitan stated it would ordinarily have been proper for him to have completed the evaluation with the assistance or guidance of his immediate supervisor. Gaitan testified this evaluation responsibility was taken away from him, but Ruskowitz testified that Hutton asked for Gaitan's input.

Dennis also produced much evidence to the effect that the evaluations were inconsistent with her actual performance. She produced positive memoranda from Hutton and Jackson, which pre-dated her first evaluation and the filing of her grievances. Dennis testified that she did not agree with the negative evaluations, and there was testimony to the effect that Dennis had a good rapport with her clients and worked extra hours. There was testimony that Gaitan worked closely with Dennis and he found her work to be in the medium range and comparable to the other managers. Verna Gilkey, a co-worker, testified that Gaitan told her that Dennis was the best person in the office. Cynthia Scott Larson, a Community Corrections employee who

was a member of the program management committee, had the opportunity to oversee Dennis' case load and found her work to be acceptable. Curtis Graham, a supervisor of community service, testified that Dennis was one of the best case managers, and he testified he never saw anything that gave him cause to write her up for wrongdoing. Gwen Hedstrom testified that, when she took over Dennis' files, she found them to be in good order. Joe Bleaker Johnson, Jr., an employment and training specialist, stated he worked with approximately 75-80% of Dennis' clients and found her to be as good a case manager as any in the agency. There was also much testimony to the effect that Dennis helped a number of her co-workers.

In addition to the foregoing, Dennis produced testimony to the effect that there was an atmosphere of retaliation and discrimination at Community Corrections. She produced testimony indicating she was targeted by Ruskowitz to be harassed and eventually fired. There was also testimony that certain employees had been cautioned by Ruskowitz not to associate with Dennis because she would not be around very long. Murial Hall, Dennis' co-worker, testified that Gaitan told Hall he had been directed by one of his superiors to write up Dennis. Gilkey, another co-worker, testified that, in the fall of 1989, Gaitan told her he did not like the fact that he had to write Dennis up, but Ruskowitz wanted her out. Ruskowitz informed Larson and other supervisors that, if Dennis and others were making comments about the way the agency was being run, he wanted documentation. There was testimony that Hutton told Dennis in a threatening manner that she should drop her EEOC complaint.

One specific incident of alleged harassment took place after Dennis' December 11 evaluation when Dennis decided to utilize some of her vacation days. Gaitan approved her vacation from December 14 until Christmas but, while she was on vacation, Hutton and Gaitan brought a letter to her house, dated December 20, 1989, and signed by Ruskowitz, that indicated she was taking annual leave to recuperate from emotional problems and would need to see a counselor before returning to work. According to Dennis, there was no internal management policy or procedure manual that required an employee to see a counselor before returning from vacation, and Ruskowitz did not know of anything

in the internal management policy that requires an employee to obtain medical treatment to keep his or her job.

At the end of her case in chief, Dennis provided evidence as to her alleged damages. Appellants moved for a directed verdict, which was denied. The jury returned a verdict in favor of Dennis in the amount of $383,000: $250,000 for lost wages and benefits and $133,000 for emotional distress.

As the parties note, the Kansas Supreme Court recently considered the claim of retaliatory discharge for whistle-blowing and a related cause of action in another case involving Ruskowitz and the Board. In *Larson v. Ruskowitz*, 252 Kan. 963, 967, 850 P.2d 253 (1993), two Community Corrections employees, Cynthia Scott Larson and Curtis Graham, were laid off during Ruskowitz' tenure as director following notice that funding and authorized staff positions would be decreased. Their release also followed closely the publishing of a newspaper article which mentioned the budget cuts and reductions. The article stated that several agency employees had been interviewed and they were concerned with the reduction in services and loss of mileage reimbursements. The employees were critical of Ruskowitz' style of management. Neither employee's name was mentioned in the article. After being discharged, the employees sued Ruskowitz and the Board on the theory that they had been discharged in retaliation for what was characterized as "whistle-blowing" in the jury instructions. On appeal, the Supreme Court reversed the jury verdicts entered in favor of the employees, due in large part to the parties' improper "blending" of two related causes of action: retaliatory discharge based upon whistle-blowing and retaliatory discharge based upon a legitimate exercise of First Amendment rights.

In *Larson*, the court quoted from *Palmer v. Brown*, 242 Kan. 893, 900, 752 P.2d 685 (1988) (recently cited with approval in *Herman v. Western Financial Corp.*, 254 Kan. 870, 869 P.2d 696 [1994]), in its restatement of the law regarding retaliatory discharge actions based upon whistle-blowing:

" 'Public policy requires that citizens in a democracy be protected from reprisals for performing their civic duty of reporting infractions of rules, regulations, or the law pertaining to public health, safety, and the general welfare. Thus, we have no hesitation in holding termination of an employee in retaliation for the good faith reporting of a serious infraction of such

rules, regulations, or the law by a co-worker or an employer to either company management or law enforcement officials (whistle-blowing) is an actionable tort. *To maintain such action, an employee has the burden of proving by clear and convincing evidence, under the facts of the case, a reasonably prudent person would have concluded the employee's co-worker or employer was engaged in activities in violation of rules, regulations, or the law pertaining to public health, safety, and the general welfare; the employer had knowledge of the employee's reporting of such violation prior to discharge of the employee; and the employee was discharged in retaliation for making the report.* However, the whistle-blowing must have been done out of a good faith concern over the wrongful activity reported rather than from a corrupt motive such as malice, spite, jealousy or personal gain.' " *Larson,* 252 Kan. at 967. (Emphasis added.)

The court then distinguished the retaliatory discharge of public or private employees because of whistle-blowing from the retaliatory discharge of a public employee for having exercised the right of freedom of speech as guaranteed by the First Amendment to the United States Constitution. The distinction between these two types of retaliatory discharge claims appears to be based upon the content, form, and context of the employee's statements: a whistle-blower reports an employer's wrongdoing; an employee exercising his or her First Amendment rights speaks out on issues of public concern. Quoting with approval from *Riddle v. City of Ottawa,* 12 Kan. App. 2d 714, 719-22, 754 P.2d 465, *rev. denied* 243 Kan. 780 (1988), the court summarized the applicable law regarding a retaliatory discharge action based upon the exercise of First Amendment rights:

" 'The law has been clear ever since *Pickering v. Board of Education,* 391 U.S. 563, 20 L. Ed. 2d 811, 88 S. Ct. 1731 (1968), that a state cannot dismiss a public employee for exercising his or her right to speak out on issues of public concern. To allow a governmental unit to discharge a person because of his or her constitutionally protected speech would have an inhibiting effect on the exercise of that freedom. [Citation omitted.] To allow a governmental unit to suspend a public employee without pay for exercising his or her right to speak on matters of public concern would have the same inhibiting effect. . . .

" 'However, a public employee's right to free speech is not absolute. "[T]he State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." There should be a balance between the interests of a public employee, as a citizen, "in commenting upon matters of public concern and the interest of the State, as

an employer, in promoting the efficiency of the public services it performs through its employees." [Citation omitted.]

" 'In *Connick v. Myers*, 461 U.S. 138, 75 L. Ed. 2d 708, 103 S. Ct. 1684 (1983), the United States Supreme Court expounded on the correct analysis to be applied to cases such as the one at bar. The first inquiry is whether Riddle's letter can be fairly characterized as constituting speech on a matter of public concern. If it cannot be, it is unnecessary for this court to scrutinize the reason for his discharge. [Citation omitted.] "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." [Citation omitted.] The question is one of law, not fact.

" 'If a public employee's speech can be characterized as addressing a matter of public concern, it is the court's responsibility to then balance the interest of the employee with the interest of the State in effectively and efficiently fulfilling its responsibilities to the public. One relevant inquiry is whether the action disrupted or undermined working relationships in the department. Also relevant is the manner, time, and place in which the letter was sent and whether this had a disruptive effect on the department or undermined the director's authority. If this balance tips in favor of the employee, the employee still has the burden of showing that the letter was a motivating factor for his or her suspension. [Citation omitted.] If Riddle meets this burden, then the burden shifts to the City to show, by a preponderance of the evidence, that it would have reached the same decision to suspend Riddle even in the absence of the communication. . . .

'The trial court found that the letter Riddle sent to the City Commission did not address a matter of public concern, but was a mere expression of his personal grievances. "[A]ppellate review of conclusions of law is unlimited." [Citation omitted.]

" 'A review of the letter Riddle sent to the City Commission shows that the majority of the letter addressed only his personal grievances. However, the letter did address at least one matter of public concern: that the fire trucks had to have a battery charger kept on them so they would start, despite the fact the batteries were new, because the radio system was a constant drain on the batteries. The community has a significant interest in knowing whether its fire department can respond quickly and efficiently in an emergency.' " 252 Kan. at 969-70.

The court in *Larson* then summarized the evidence presented, quoted the key instructions on Larson's claim, and concluded:

"The evidence in this case does not fit the scenario that the employer 'was engaged in conduct in violation of rules, regulations, or the law pertaining to public health, safety, and the general welfare,' or that the employees were discharged for reporting the violation as in *Palmer v. Brown*, 242 Kan. 893, 752 P.2d 685 (1988). No claim was made that Ruskowitz misappropriated funds or committed any criminal act. Laws, rules, or regulations concerning public health, safety, or general welfare are not involved

in the claims herein. In short, this is not a whistle-blowing case. Thus, the public policy considerations underlying whistle-blowing cases are absent. Rather, any protection to be afforded plaintiffs must come through their First Amendment rights of freedom of speech as discussed in *Riddle v. City of Ottawa*, 12 Kan. App. 2d 714, 754 P.2d 465, *rev. denied* 243 Kan. 780 (1988), and cases cited therein, subject to the requisite threshold determinations previously discussed." 252 Kan. at 974.

The court stated that, although cases like *Palmer* and *Riddle* did not differentiate between the two claims, such a distinction was necessary in *Larson*. As a result, the court reversed and remanded for proceedings consistent with retaliatory discharge actions based upon violations of public employees' First Amendment rights. 252 Kan. at 975. Unfortunately, the trial court and the parties to the present case did not have the benefit of the *Larson* decision when the present case was tried.

Dennis emphasizes another Community Corrections case, *Pilcher v. Board of Wyandotte County Comm'rs*, 14 Kan. App. 2d 206, 213, 787 P.2d 1204, *rev. denied* 246 Kan. 768 (1990), wherein this court reversed a directed verdict in favor of the Board on the basis that there was evidence upon which the jury could have found in Pilcher's favor on her claim of retaliatory discharge for whistle-blowing. This court held:

"We believe and hold that Pilcher's evidence showed all of the elements required by *Palmer v. Brown* to carry her case to the jury on the theory of retaliatory discharge for whistle-blowing. We note that the *Palmer* decision discusses discharging an employee for reporting a violation of the law pertaining to public health, safety, and the general welfare. We do not believe that those areas are exclusive in proving a claim for retaliatory discharge. If the matters reported in the Kansas City Times were true, and there is evidence that they were, the county was engaging in very questionable hiring practices which ultimately would have a detrimental effect on the general welfare of the taxpayers of Wyandotte County. If we were to permit Pilcher to be discharged because the Board believed she was the source of the newspaper article, we would be cutting off a very important source of public information concerning the operation of local and state governments. Therefore, even though the action of the Board in hiring Wallace may not have been in violation of the law, it was certainly sufficiently harmful to the public interest to qualify it as the basis for a claim of retaliatory discharge for 'whistle-blowing.' " 14 Kan. App. 2d at 212-13.

*Pilcher* is very similar to *Larson* in that no law, rule, or regulation was alleged to have been broken. When the content of Pilcher's statements is viewed in light of *Larson*, Pilcher's retal-

iatory discharge claim was not based upon whistle-blowing, but rather upon the exercise of her First Amendment rights. However, in *Larson* the court did not specifically overrule *Pilcher*. In fact, *Pilcher* is cited in *Larson* for the proposition that it does not matter whether a plaintiff actually made the alleged comments—what is important is that the employer believed the plaintiff was the source and terminated plaintiff for that reason. 252 Kan. at 973. Because the newspaper article in the present case is similar to those in *Pilcher* and *Larson*, Dennis' allegation that she was discharged because of her contribution to the article is more appropriately characterized as a First Amendment case, not a whistle-blowing case. See *Larson*, 252 Kan. at 968-71. Like *Larson*, the jury instructions here referred specifically to whistle-blowing and did not distinguish or address any alleged retaliatory discharge claim by Dennis based upon the exercise of her First Amendment rights.

Dennis argues that, even if *Larson* effectively overrules *Pilcher* as it relates to that portion of her case pertaining to her alleged contribution to the newspaper article, her retaliatory discharge claim based upon whistle-blowing was supported by additional evidence. She contends she established a claim for retaliatory discharge for whistle-blowing by presenting evidence to support two alternate theories: (1) that she was discharged for filing grievances claiming she was discriminated against; and (2) that she was discharged for reporting Ruskowitz's improper handling of the social fund.

Dennis presented some evidence to support these alternate theories, but the jury was not instructed on these theories. Instead, Dennis' petition and the jury instructions clearly emphasized Dennis' contribution to the newspaper article. The relevant jury instructions, instructions 7 and 9, are very similar to instructions 7 and 9 in *Larson*, 252 Kan. at 974:

Instruction 7:

"The plaintiff contends that she was wrongfully discharged/terminated in retaliation for statements and comments she made to a local newspaper, to Wyandotte County Commissioners, and to other agency employees regarding Joseph Ruskowitz's violation of rules and regulations pertaining to the general welfare and operation of the Wyandotte County Community Corrections Agency."

Instruction 9:

"In order to maintain a claim based on the 'whistle-blowing' exception, the employee must prove that:

"(1) The employee's employer was engaged in conduct in violation of rules, regulations, or the law pertaining to public health, safety, and the general welfare;

"(2) The employer had knowledge of the employee's reporting of such violations prior to the discharge; and

"(3) The employee was discharged in retaliation for making the report.

"The 'whistle-blowing' must have been done out of good faith concern over the wrongful activity reported rather than from a corrupt motive of the employee, such as malice, spite, jealousy or personal gain."

In *Larson*, the court held the interests of justice required reversal of the judgment appealed and remand for a judicial winnowing of the statements involved to determine whether any of the statements dealt with matters of public concern. If the trial court found there were statements involving a matter of public concern, the court was then to perform a balancing test in which protected speech is weighed against the employer's rights. If Larson's claims survived these threshold determinations by the court, her case could be submitted to a jury properly instructed on the claims presented. We conclude the statements which serve as the basis for Dennis' claims must also be examined in light of *Larson* and, if the claims survive the court's initial scrutiny and the case is submitted to a jury, the jury must then be properly instructed to enable it to determine whether Dennis has established a claim for retaliatory discharge based upon whistle-blowing and/or a claim for retaliatory discharge based upon a violation of First Amendment rights.

We note in *Larson* there were no allegations that Ruskowitz misappropriated any funds or committed any criminal act. Here, Dennis' alternate theories include such allegations. However, these allegations concerning misappropriation of funds or potentially criminal acts were not included as a basis for her retaliatory discharge claim as defined in the jury instructions and, therefore, do not provide a basis for upholding the jury's verdict. Regarding Dennis' allegation that her grievances and complaints led to her discharge, her first two grievances were in-house and therefore to agency employees. Such grievances do not constitute whistle-

blowing. See *Larson*, 252 Kan. at 967. Also, there is nothing in the instruction about the EEOC or the Civil Rights Commission grievances. Regarding the social fund, Dennis' confrontation with Ruskowitz was in-house and does not fit the definition of whistle-blowing. The instruction does not mention the Department or the district attorney's office.

Further, regarding the alleged misappropriation of the social fund, Dennis did not present sufficient evidence to support her theory that she was discharged for reporting Ruskowitz' alleged misappropriation or mishandling of the fund. Dennis presented no evidence that she reported Ruskowitz' misuse or misappropriation of the fund prior to her discharge. Appellants presented testimony from an investigator for the district attorney's office which indicated that Dennis contacted the Department only after Ruskowitz sent her a letter stating she would be terminated, pending a show cause hearing. Therefore, Dennis did not show Ruskowitz was aware of her report prior to discharging her.

Reversed and remanded for further proceedings consistent with this opinion.