Kathleen J. **BOYER**, Plaintiff,

v.

The **BOARD OF COUNTY COMMISSIONERS OF the COUNTY OF JOHNSON COUNTY**, Defendant.

No. 94–4078–SAC.

United States District Court,
D. Kansas.

March 5, 1996.

Kirk W. Lowry, Palmer & Lowry, Topeka, KS, David G. Summers, Richard E. McLeod, The McLeod Law Firm, Kansas City, MO, for plaintiff.

LeeAnne Hays Gillaspie, Johnson County Legal Department, Olathe, KS, for defendant.

## MEMORANDUM AND ORDER

CROW, District Judge.

On May 13, 1994, Kathleen J. Boyer commenced this action against the Board of County Commissioners of Johnson County (BOCC). Boyer alleges jurisdiction under 28 U.S.C. § 1331 [1] as well as supplemental jurisdiction over her state law claims. Count I of Boyer's complaint alleges that she was wrongfully constructively discharged from her position with the Johnson County Area Agency on Aging (AAA), a division of the Humans Services and Aging Department, (HSA) in retaliation for the exercise of her First Amendment right to freedom of speech. Specifically, Boyer alleges that her supervisor, Trish Moore, as Director of HSA, basically made her working conditions intolerable after Boyer voiced certain criticisms about the management of HSA and AAA. Count II of Boyer's complaint alleges a claim under 42 U.S.C. § 1983 in that "Moore's retaliatory actions were taken in Moore's capacity as the Johnson County Director of HSA and thus, under color of state law."

On November 16, 1994, this court entered an order denying BOCC's motion to dismiss. *See Boyer v. Board of County Commissioners of Johnson County*, No. 94–4078–SAC, 1994 WL 732600 (D.Kan. Nov. 16, 1994). The court concluded that Boyer had plead sufficient facts to demonstrate that she was not asserting liability against the BOCC on a theory of respondeat superior, but instead that she was seeking to impose liability against the BOCC under § 1983 based upon her contention that Moore was the final policymaker concerning her employment with the BOCC. On January 19, 1995, the court

---

1. "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, law, or treatises of the United States." 28 U.S.C. § 1331.

entered a memorandum and order granting the BOCC's motion for determination of trial. *See Boyer v. Board of County Commissioners of Johnson County,* No. 94–4078–SAC, 1995 WL 106346 (D.Kan. Jan. 19, 1995) (case to be tried in Kansas City, Kansas).

This case comes before the court upon the following motions:

1. BOCC's motion to dismiss (Dk. 58).

2. BOCC's motion for summary judgment (Dk. 41). In its motion to dismiss, the BOCC seeks to dismiss Count I of Boyer's complaint for failure to state a claim upon which relief can be granted. In its motion for summary judgment, the BOCC advances two arguments. First, the BOCC contends that Trish Moore was not a "final policymaker" with respect to the terms and conditions of Boyer's employment, and therefore it cannot be liable under § 1983. Second, the BOCC contends that the statements which Boyer claims she made which were the basis of her constructive discharge were not statements regarding matters of public concern, and therefore those statements were not entitled to first amendment protection.[2]

## BOCC's Motion to Dismiss

To fully understand the BOCC's motion to dismiss, it is necessary for the court to briefly recount the history of this case and the events leading to the issues presented by this motion. Count I of Boyer's complaint asserts a state law claim titled "WRONGFUL DISCHARGE IN VIOLATION OF BOYER'S FIRST AMENDMENT RIGHT TO FREEDOM OF SPEECH." Count II of Boyer's complaint asserts a virtually identical claim titled "42 U.S.C. § 1983." The only additional allegations in Count II are that (1) "Moore's retaliatory actions against Boyer were taken in Moore's capacity as the Johnson County Director of HSA and thus, under color of state and law" and that (2) "Moore's retaliatory actions deprived Boyer of her

First Amendment right of free speech secured by the United States Constitution."

Based upon the actual language of the plaintiff's complaint, throughout this case, the defendant and this court have presumed that both of Boyer's claims were premised upon an alleged violation of her first amendment right to freedom of speech. At the final pretrial conference, the BOCC apparently objected to Boyer's state law claim as superfluous and duplicative of her § 1983 claim. At that time, counsel for Boyer apparently initially orally agreed to withdraw the state law claim. In a letter dated August 17, 1995, counsel for Boyer changed his position:

At the time I was only thinking of damages and agreed to withdraw the state claim. At this point I request that you reinstate our state law claim. The Defendants (sic) filed a Motion for Summary Judgment stating that Trish Moore is not the final decision maker and that Katie Boyer's speech was not a matter of public concern. The significance of my state law claim is that under state law, Kansas Tort Claims Act governs and I only have to prove that Trish Moore's conduct was within the scope of her authority. Under § 1983 I have to prove that she was the final decision maker.

While I think there is a lot of interweaving of the two theories and that the Kansas Tort Claims Act probably governs under § 1983, I would like to reinstate the state law claim.

Letter dated August 17, 1995.

In a letter dated August 22, 1995, counsel for the BOCC objected to Boyer's request to include her common law claim, arguing that Boyer's request was untimely and prejudicial. The BOCC argued that the inclusion of this new claim would require the filing of

---

**2.** The BOCC also argues that Boyer never made any statements regarding Trish Moore, and therefore there is no factual basis for Boyer's contention that Moore retaliated against her for voicing criticism about her performance as manager. The BOCC also argues that Boyer cannot demonstrate that Moore was ever informed about the criticisms Boyer allegedly voiced. Boyer counters that argument with her own pre-

collection that she made statements critical of Moore. Boyer contends that Moore knew about the comments she had made during the focus groups and began to retaliate against her following the encounter group.

In light of its ruling, it is unnecessary for the court to resolve these alternative grounds for summary judgment advanced by the BOCC.

additional briefs in support of its motion for summary judgment which had already been filed. In response to the letters of counsel, in a letter dated August 28, 1995, because no formal journal entry of dismissal had been entered, the magistrate judge permitted Boyer to include her common law claim in the pretrial order. However, the BOCC was granted an opportunity to file a dispositive motion regarding Boyer's state common law claim.

Since that time, the magistrate judge has submitted to this court a proposed pretrial order which includes Boyer's common law claim. However, in light of pending motions, the court did not want to sign the pretrial order until it had a sufficient opportunity to sort through the pending motions. The court, having the benefit of considering the entire file including the pending dispositive motions, has signed the pretrial order.

 In its motion to dismiss, the BOCC recounts the history of this case. The BOCC then argues that as a matter of law, Boyer cannot pursue a state common law claim governed by the Kansas Tort Claims Act (KTCA) for retaliatory constructive discharge based on an alleged violation of her first amendment right to free speech. Synthesized, the BOCC contends that the KTCA establishes governmental liability under circumstances where the governmental entity, *if a private person,* would be liable under the laws of Kansas. *See* K.S.A. 75–6103(a) ("Subject to the limitations of this act, each governmental entity shall be liable for damages caused by the negligent or wrongful act or omission of any of its employees while acting within the scope of their employment under circumstances where the governmental entity, if a private person, would be liable under the laws of this state."). The BOCC argues that because only a governmental entity and not a private person can violate

another person's first amendment right,[3] under no circumstance can the BOCC be liable under the KTCA for its alleged violation of Boyer's first amendment right to free speech.

In her response, Boyer does not dispute the BOCC's version of the factual history of this case. Boyer tacitly concedes that the BOCC's analysis of Count I would be correct if she were in fact asserting a freedom of speech claim based upon the violation of her first amendment rights. Boyer contends, however, that the BOCC has completely misconstrued the nature of her cause of action in Count I as a state retaliatory discharge common-law cause of action predicated upon violation of her first amendment rights. "There has been much confusion in this area. Plaintiff's claim is not based on the First Amendment of the Constitution. The Plaintiff's state common-law cause of action is based on Plaintiff's state constitutional right to free speech as found in the Kansas constitution Bill of Rights, Section 11." "The Plaintiff's cause of action is grounded in the public policy of the state of Kansas that citizens of the state of Kansas have a right to free speech that is an inalienable right." Unlike the first amendment of the constitution, Boyer suggests that the Kansas Constitution is a complete guarantee of freedom speech which applies to both the government and private persons. In short, Boyer suggests that "it must be against the public policy of the state of Kansas to discharge an employee for exercising their natural right to free speech."

The BOCC's reply advances two primary responses. First, the BOCC argues that throughout this case, Count I of Boyer's complaint asserts a violation of her first amendment right to freedom of speech. To the extent that Boyer's claim in Count I can be construed as predicated on a "whistle-blowing" theory, the BOCC contends that

[3]. "By its terms, the first amendment serves to limit state action, not action which is private in character." *Pleasant v. Lovell,* 876 F.2d 787, 796 n. 1 (10th Cir.1989) (*citing Lloyd Corp. v. Tanner,* 407 U.S. 551, 567, 92 S.Ct. 2219, 2228, 33 L.Ed.2d 131 (1972)). "While statutory or common law may in some situations extend protection or provide redress against a private corporation or person who seeks to abridge the free expression of others, no such protection is pro-vided by the Constitution itself." *Hudgens v. NLRB,* 424 U.S. 507, 513, 96 S.Ct. 1029, 1033, 47 L.Ed.2d 196 (1976). *See Hurley v. Irish–American Gay Group,* —— U.S. ——, 115 S.Ct. 2338, 132 L.Ed.2d 487, 499 (1995) ("[T]he guarantees of free speech and equal protection guard only against encroachment by the government and 'erec[t] no shield against merely private conduct.'") (*quoting Shelley v. Kraemer,* 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948)).

such a new claim is untimely and prejudicial. The BOCC contends that a whistle-blower claim is a distinct cause of action with elements uncommon to a first amendment claim and that there can be no justification for allowing Boyer to "so drastically reinterpret her own words at this point in this litigation." Second, the BOCC contends that Boyer's suggestion that the Kansas constitution applies whether or not there is a state action is unsupported by any authority and that "the logical extension of which would be to render *all* employers liable for any action taken against an employee for saying anything, no matter how egregious or harmful the speech might be to the employer's interests."

## Legal Standards

### Fed.R.Civ.P. 12(b)(6)

A court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). Dismissal is appropriate "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984) (citing *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)). "The purpose of Rule 12(b)(6) is to allow a defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief even if everything alleged in the complaint is true." *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir.1993); *see Hospice of Metro Denver v. Group Health Ins.*, 944 F.2d 752, 753 (10th Cir.1991) ("Dismissal of a case pursuant to Fed.R.Civ.P. 12(b)(6) requires the legal determination that the plaintiff can prove no set of facts in support of his claim to entitle him to relief.") (citations omitted); *Thatcher Enterprises v. Cache County Corp.*, 902 F.2d 1472 (10th Cir.1990) ("Under Rule 12(b)(6), dismissal is inappropriate unless plaintiff can prove no set of facts in support of his claim to entitle him to relief.").

A court judges the sufficiency of the complaint accepting as true the well-pleaded factual allegations and drawing all reasonable inferences in favor of the plaintiff. *Shaw v. Valdez*, 819 F.2d 965, 968 (10th Cir.1987). It is not the court's function "to weigh potential evidence that the parties might present at trial." *Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir.1991).[4] The court construes the allegations in the light most favorable to the plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Hall v. Bellmon*, 935 F.2d 1106, 1109 (10th Cir.1991). These deferential rules, however, do not allow the court to assume that a plaintiff "can prove facts that it has not alleged or that the defendants have violated the ... laws in ways that have not been alleged." *Associated General Contractors. v. California State Council of Carpenters*, 459 U.S. 519, 526, 103 S.Ct. 897, 902, 74 L.Ed.2d 723 (1983) (footnote omitted). Dismissal is a harsh remedy to be used cautiously so as to promote the liberal rules of pleading while protecting the interests of justice. *Cayman Exploration Corp. v. United Gas Pipe Line*, 873 F.2d 1357, 1359 (10th Cir. 1989).

## Analysis

The court grants the BOCC's motion to dismiss Count I of Boyer's complaint. To the extent that Boyer is implicitly attempting to establish liability against the BOCC under a whistle-blower theory, such a claim is dismissed as untimely and prejudicial. *See Williams v. Atchison, Topeka and Santa Fe Railway Corp.*, No. 91 4221–C, 1992 WL 331272 (D.Kan. Oct. 9, 1992) (affirming magistrate judge's order denying plaintiff's motion to amend the complaint). It is inappropriate to use a response to a motion to dismiss to essentially raise a new claim for the first time. Under Kansas law, a whistle-blower claim is distinct from a first amendment claim, *see Dennis v. Ruskowitz*, 19 Kan.App.2d 515, 873 P.2d 199 (1994) ("The distinction between retaliatory discharge of a public or private employee because of whis-

---

**4.** "[T]he court need accept as true only the plaintiff's well-pleaded factual contentions, not his conclusory allegations." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir.1991). The court is "not compelled to accept, however, conclusory allegations concerning the legal effect of facts set out in the complaint." *Baxter by Baxter v. Vigo County School Corp.*, 26 F.3d 728, 730 (7th Cir. 1994).

tle-blowing and retaliatory discharge of a public employee for the exercise of the right of freedom of speech as guaranteed by the First Amendment to the United States Constitution is based upon the content, form, and context of the employee's statements: a whistle-blower reports an employer's wrongdoing; an employee exercising his or her First Amendment rights speaks out on issues of public concern."), and it would be prejudicial to the defendant at this juncture to permit the plaintiff to change the nature of her claim in this manner.

■■■ As to Boyer's contention that the provisions of the Kansas constitution regarding free speech would apply equally to both public and private actors, such a proposition is unsupported by any authority. Such an interpretation and extension of the law of Kansas seems unwarranted for several reasons. First, if the law of Kansas were so, every employee sanctioned or terminated for exercising her right to freedom of speech would have a claim against her employer.[5] Second, such as extension of the law of Kansas would undermine the long established employment at will doctrine. *Cf. Railway Co. v. Brown*, 80 Kan. 312, 102 P. 459 (1909) ("[I]n the absence of a contract of employment for a definite term the master may discharge the servant for any reason or for no reason, and that the servant may quit his employment for any reason or for no reason. Such action on the part of the employer or the employee, where no obligation is violated, is an essential element of liberty in action."). Finally, the extension of the law suggested by Boyer is apparently unprecedented and contrary to the manner in which the Kansas constitution has apparently otherwise been construed. *See State v. Russell*, 227 Kan. 897, 899, 610 P.2d 1122 (1980) (First Amendment of United States Constitution and Section 11 of the Kansas Bill of Rights are "generally considered coextensive"), *cert. denied*, 449 U.S. 983, 101 S.Ct. 400, 66 L.Ed.2d 245 (1985). In sum, the court concludes that Kansas would not recognize a cause of action based upon a private employer's violation of its employee's state constitutional right to

freedom of free speech. *Cf. Albertson's, Inc. v. Ortiz*, 856 S.W.2d 836, 841 (Tex.App.— Austin 1993) ("Despite this state's strong guarantees of freedom of expression, we decline appellees' invitation to infer from the Texas Constitution an action for damages to redress a private person's violation of another's freedom of speech."); *see also Ex Parte Tucci*, 859 S.W.2d 1, 16–17 n. 1 (Tex.1993) (Phillips, C.J., concurring) (collecting cases discussing whether state constitutional provisions govern conduct of private actors or entities).

In sum, the court grants the BOCC's motion to dismiss Count I.

### Motion for Summary Judgment

In its motion for summary judgment, the BOCC contends that Boyer cannot attribute her constructive discharge to a person qualifying as a final policymaker within the meaning of § 1983, and therefore her § 1983 claim fails as a matter of law.

### Summary Judgment Standards

■■■ A court grants a motion for summary judgment if a genuine issue of material fact does not exist and if the movant is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The substantive law governing the suit dictates which facts are material or not. *Id.* at 248, 106 S.Ct. at 2510. "Only disputes over facts that might affect the outcome of the suit under the governing law will ... preclude summary judgment." *Id.* There are no genuine issues for trial if the record taken as a whole would not persuade a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "[T]here are cases where the evidence is so weak that the case does not raise a genuine issue of fact." *Burnette v. Dow Chemical Co.*, 849 F.2d 1269, 1273 (10th Cir.1988).

■■■ The movant's burden under Rule 56 of the Federal Rules of Civil Procedure is to lay out the basis of its motion and to "point to those portions of the record that

---

**5.** Conversely, an employer would conceivably have a cause of action against an employee who quit because she found the employer's exercise of his or her right to freedom of speech repugnant.

demonstrate an absence of a genuine issue of material fact given the relevant substantive law." *Thomas v. Wichita Coca–Cola Bottling Co.,* 968 F.2d 1022, 1024 (10th Cir.), *cert. denied,* 506 U.S. 1013, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992). "A movant is not required to provide evidence negating an opponent's claim." *Committee for First Amendment v. Campbell,* 962 F.2d 1517, 1521 (10th Cir.1992) (citation omitted).

 If the moving party meets its burden, then it becomes the nonmoving party's burden to show the existence of a genuine issue of material fact. *Bacchus Industries, Inc. v. Arvin Industries, Inc.,* 939 F.2d 887, 891 (10th Cir.1991); *see Martin v. Nannie and the Newborns, Inc.,* 3 F.3d 1410, 1414 (10th Cir.1993) ("If the moving party meets this burden, the non-moving party then has the burden to come forward with specific facts showing that there is a genuine issue for trial as to elements essential to the non-moving party's case."). When the non-moving party will have the burden of proof at trial, " 'Rule 56(e) ... [then] requires the nonmoving party to go beyond the pleadings and by her own affidavits or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Mares v. ConAgra Poultry Co., Inc.,* 971 F.2d 492, 494 (10th Cir.1992) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). "Unsubstantiated allegations carry no probative weight in summary judgment proceedings." *Phillips v. Calhoun,* 956 F.2d 949, 951 (10th Cir.1992) (citations omitted); *see Martin,* 3 F.3d at 1414 (non-moving party cannot rest on the mere allegations in the pleadings). "Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." *Hedberg v. Indiana Bell Telephone Co., Inc.,* 47 F.3d 928, 929 (7th Cir.1995); *see Vega v. Kodak Caribbean, Ltd.,* 3 F.3d 476, 479 (1st Cir.1993) ("Optimistic conjecture, unbridled speculation, or hopeful surmise will not suffice."). The court views the evidence of record and draws inferences from it in the light most favorable to the nonmoving party. *Burnette v. Dow Chemical Co.,* 849 F.2d at 1273.

 More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). At the same time, a summary judgment motion is not the chance for a court to act as the jury and determine witness credibility, weigh the evidence, or decide upon competing inferences. *Windon Third Oil and Gas v. Federal Deposit Ins.,* 805 F.2d 342, 346 (10th Cir. 1986), *cert. denied,* 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987).

### Uncontroverted Facts

The BOCC sets forth seventy-four separate paragraphs of uncontroverted facts. In response, Boyer attempts to controvert only four of those paragraphs. Under D.Kan. Rule 56.1, all of the other paragraphs set forth by the BOCC are deemed admitted. Boyer also sets forth her own statement of facts, to which the BOCC has replied. In light of its disposition of this motion, the court deems it unnecessary to slog through each and every uncontroverted fact set forth by the BOCC and Boyer. In setting forth the uncontroverted facts, the court has endeavored to streamline the relevant facts necessary to its decision to their simplest form. The facts are set forth in the light most favorable to the plaintiff.

The Johnson County Department of Human Services and Aging (HSA) is one of thirty-five departments and agencies of the Johnson County Government. HSA is currently comprised of five teams which are the Area Agency on Aging (AAA); Information and Outreach; Client Services; Housing; and Administration. Prior to the departmental reorganization which became effective in July, 1993, the HSA was comprised of five divisions: Administration and Outreach; Home Energy and Maintenance; Information and Access; Area Agency on Aging and Housing Authority.

Boyer was employed by Johnson County in the AAA from May 29, 1985, to August 27, 1993. Trish Moore has been the director of

HSA since August, 1975. Annice White was the Director of AAA from approximately 1983 until 1993. Annice White hired Boyer and was Boyer's supervisor until June 1993.

Effective November 1990, Boyer's position was titled Long Term Care Unit Supervisor. In that capacity, Boyer supervised seven persons, including a student intern. In late 1992, Moore was approached by Cheryl Leichliter, the Director of the Johnson County Human Resources Department, regarding personnel problems that had arisen within HSA, and in particular the AAA. Specifically, Human Resources was concerned about the high rate of turnover in AAA. In September of 1992, Moore was contacted by a person from Human Resources regarding exit interviews of departing employees who had been under Boyer's supervision. The persons interviewed were very critical of Boyer's supervisory skills, and Human Resources felt that these criticisms should be addressed.

Concern about the personnel problems within HSA prompted Human Resources to consider reorganization of the entire organization. With approval from the Board of County Commissioners, HSA allocated $20,-000 to obtain an organizational study from the Hay Management Group. As part of its study, the Hay Management Group conducted "non-directive focus groups" consisting of seven to twelve similarly situated employees. The purpose of the focus groups was to "provide qualitative input on how the organization currently functions and employee values. It will also identify issues relating to the direction the organization should take in structuring its operations and establishing programs to guide new employee behavior." After numerous preliminary meetings between representatives of the Hay Management Group, Human Resources and Trish Moore, the Hay Management Group conducted individual interviews with the highest level supervisors of HSA and focus groups with the rest of HSA's employees.

Boyer participated in a focus group which included eight other persons. The comments made by the participants of the focus group were supposed to be confidential. During the focus group, Boyer made comments which she believed to be critical of Trish Moore. The other participants in the group, including the person directing the group, do not recall Boyer making such comments.

Based upon its analysis of the information it gathered, the Hay Management Group suggested reorganization of the departmental structure of the HSA. As a result of the reorganization, most of the job structures and/or job responsibilities of all HSA employees were changed.

In any event, following her discussion during the focus group, according to Boyer, Trish Moore embarked on a course of retaliation against Boyer.[6] Boyer believed that this retaliation took the form of cutting off communication, avoiding eye contact, demotion to a non-supervisory position,[7] increased monitoring and not allowing Boyer to apply for the new team leader position. Ultimately, Boyer resigned because she believed her working conditions were intolerable.

Johnson County has numerous personnel policies regarding its employees. Boyer was familiar with those policies. Those policies provide, *inter alia*, for uniform application of all policies to all employees, that the BOCC is responsible for approving the personnel policy, that the policy of the County is to hire and retain individuals based on merit, and that department directors are prohibited from taking any action in retaliation for the legitimate exercise of any legal right. The policies also provide for a conciliation process addressing employee issues concerning working conditions, promotion, performance appraisals and leave requests with Human Resources as the facilitator. Policy Number 618 provides for a due process hearing before the BOCC in the event of suspensions without pay, demotions and terminations. Another policy provides for a grievance procedure before the County Administrator to address

6. Moore denies that anyone communicated to her any of Boyer's personal criticisms and denies that she ever retaliated against Boyer.

7. The BOCC contends that this was not a demotion but simply a result of the reorganization of the AAA. Boyer's grade level and salary did not change as a result of the reorganization.

unfair working conditions or unjust discipline not covered by Policy Number 618.

These procedures are regularly utilized to address employee grievances and contested disciplinary actions. Since January 1, 1992, eighteen due process hearings have been conducted by the Board of County Commissioners in which the proposed disciplinary action has been modified in favor of the employee in six instances. In the same time period, ten grievances have been heard by the County Administrator in which one employee was granted the relief sought. Annually, Human Resources conducts approximately twenty conciliation procedures. Depending on the manner in which Boyer had articulated her complaint about the reorganization of HSA or any other complain, she could have utilized any or all of the foregoing procedures.

### Municipal Liability under § 1983

In *Baxter by Baxter v. Vigo County School Corp.*, 26 F.3d 728 (7th Cir. 1994), the court of appeals summarized the law concerning municipal liability under § 1983:

A local governmental unit is subject to suit under 42 U.S.C. § 1983 because it is deemed a "person" within the meaning of that provision. *Monell v. Department of Social Servs.*, 436 U.S. 658, 690, 98 S.Ct. 2018, 2035, 56 L.Ed.2d 611 (1978). The Supreme Court has consistently interpreted this language as barring *respondeat superior* liability on the part of a local governmental unit. *See Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 735–36, 109 S.Ct. 2702, 2723, 105 L.Ed.2d 598 (1989); *City of Canton v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 1202, 103 L.Ed.2d 412 (1989); *Monell*, 436 U.S. at 691, 98 S.Ct. at 2036; *see also Auriemma v. Rice*, 957 F.2d 397, 399 (7th Cir.1992) ("Municipalities are answerable only for their own decisions and policies; they are not vicariously liable for the constitutional torts of their agents."). Rather, "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694, 98 S.Ct. at 2037. The caselaw has identified three instances in which a municipality can be said to have violated the civil rights of a person because of its policy: (1) an express policy that, when enforced, causes a constitutional deprivation, *see, e.g. Monell*, 436 U.S. at 690, 98 S.Ct. at 2035; (2) "a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a 'custom or usage' with the force of law,' " *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127, 108 S.Ct. 915, 926, 99 L.Ed.2d 107 (1988) (plurality opinion) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–68, 90 S.Ct. 1598, 1613–14, 26 L.Ed.2d 142 (1970)); see also 485 U.S. at 138 [108 S.Ct. at 931–32] (Brennan, J., concurring); or (3) an allegation that the constitutional injury was caused by a person with "final policymaking authority," *Praprotnik*, 485 U.S. at 123, 108 S.Ct. at 923; *id.* at 139, 108 S.Ct. at 932 (Brennan, J., concurring); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 106 S.Ct. 1292, 1300, 89 L.Ed.2d 452 (1986) (plurality opinion).

26 F.3d at 734–735 (footnote omitted). *See e.g., Jantz v. Muci*, 976 F.2d 623, 630–631 (10th Cir.1992) (in Kansas, the final hiring authority rests in the school boards, and that the school boards have no authority to delegate hiring authority to subordinates), *cert. denied*, 508 U.S. 952, 113 S.Ct. 2445, 124 L.Ed.2d 662 (1993); *Ware v. Unified School Dist. No. 492*, 902 F.2d 815 (10th Cir.1990) (same); *Flanagan v. Munger*, 890 F.2d 1557, 1568–1569 (10th Cir.1989) (Colorado Springs police chief, who had direct management and supervision responsibilities, was final policymaker with respect to departmental discipline).

In *Randle v. City of Aurora*, 69 F.3d 441 (10th Cir.1995), the Tenth Circuit summarized the case law recognizing municipal liability under the final decisionmaker analysis.

In *Pembaur v. City of Cincinnati*, the Supreme Court held that the search of a doctor's office without a warrant gave rise to municipal liability because the County

Prosecutor was acting as a "final decision-maker" when he ordered the illegal search. 475 U.S. 469, 484–85, 106 S.Ct. 1292, 1301, 89 L.Ed.2d 452 (1986). Justice Brennan explained that if an official, who possesses final policymaking authority in a certain area, makes a decision—even if it is specific to a particular situation—that decision constitutes municipal policy for § 1983 purposes. *Id.* at 481, 106 S.Ct. at 1299. Hence, such an act can be understood as an act "of the municipality" which the municipality "officially sanctioned or ordered." *Id.* at 480, 106 S.Ct. at 1298.

However, *Pembaur* left open the question of how to determine who is a "final policymaker." That question was later addressed in *City of St. Louis v. Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988). [FN9] First, *Praprotnik* explained that "final policymaking authority" is a legal issue to be determined by the court based on state and local law. *Id.* at 124, 108 S.Ct. at 924. *Praprotnik* then reasoned that, since the St. Louis Civil Service Commission possessed final authority on personnel decisions, *id.* at 129–30, 108 S.Ct. at 927–28, the discretionary hiring and firing decisions by subordinate employees did not constitute final policymaking by the municipality. This reasoning relied on the four touchstones of municipal liability outlined in *Pembaur. Id.* at 123, 108 S.Ct. at 924. First, a municipality can only be held liable for acts which the municipality itself is responsible—that is, those it has "officially sanctioned or ordered." Second, only those officials with "final policymaking authority" can subject a municipality to liability. Third, the question of whether an official has "final policymaking authority" is a question of state law. Fourth, the challenged conduct must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy in that area. *Id.*

FN 9. While the references to *Praprotnik* refer to Justice O'Connor's plurality opinion, that opinion can fairly be read as binding precedent ·because it was apparently adopted by a full majority of the Supreme Court in *Jett,* 491 U.S. at 737–38, 109 S.Ct. at 2724.

*Praprotnik* also set out the basic "conundrum" and "line drawing exercise" that lower courts face in ascertaining the existence of a municipal policy:

> If the mere exercise of discretion by an employee could give rise to a constitutional violation, the result would be indistinguishable from *respondeat superior* liability. If, however, a city's lawful policymakers could insulate the government from liability simply by delegating their policymaking authority to others, § 1983 could not serve its intended purpose.

*Id.* at 126–27, 108 S.Ct. at 926. In outlining the "elegant line" drawing exercise of assigning municipal liability, Justice O'Connor highlighted two guiding inquiries: (1) whether a subordinate's discretionary decisions are constrained by general policies enacted by others; and (2) whether the subordinate's specific decisions are reviewable by others. *Id.* at 127, 108 S.Ct. at 926. This guidance largely flowed from an example offered in Justice Brennan's plurality opinion in *Pembaur v. Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). Justice Brennan explained that in the case where the Board of County Commissioners established county employment policy and delegated to the County Sheriff alone the discretion to hire and fire employees pursuant to that policy, the county itself would not be liable if the Sheriff unconstitutionally exercised this authority because the "decision to act unlawfully would not be a decision of the Board." *Id.* at 483 n. 12, 106 S.Ct. at 1300 n. 12. However, if the sheriff had been delegated final responsibility for establishing employment policy—i.e., if the sheriff was not subject to any meaningful review or constraints—then the county could be held liable for his actions within the grant of his official authority. *Id.* Justice Brennan defined a "policy" as "a course of action [consciously chosen] from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Id.* at 483–84, 106 S.Ct. at 1300. However, he underscored that while the quintessential policy is a governmental entity's "establish[ed] fixed plans of action to be followed under similar circumstances consistently and over time," *id.* at 480–81, 106 S.Ct. at 1299, policy can also be established pursuant to a specific and one-time decision made by a "final policymaker," *id.* at 481, 106 S.Ct. at 1299.

69 F.3d at 447–48.

 Based upon this case law, the Tenth Circuit set forth three elements to consider in determining whether an individual is a final policymaker:

> Guided by the general principles outlined above, we can identify three elements that help determine whether an individual is a "final policymaker": (1) whether the

official is meaningfully constrained "by policies not of that official's own making;" (2) whether the official's decision are final—i.e., are they subject to any meaningful review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority. *Praprotnik,* 485 U.S. at 127, 108 S.Ct. at 926; *Ware v. Unified School Dist.,* 902 F.2d 815, 818 (10th Cir.1990) ("Delegation does not occur when a subordinate's decisions are constrained by policies not of his making or when those decisions are subject to review by the authorized policymaker.").

In order to determine whether an individual holds "final policymaking" authority, we begin by examining the legal chain of authority. *See Jantz v. Muci,* 976 F.2d 623, 631 (10th Cir.1992) (school board not liable for school principal's actions because the school board had ultimate legal authority to review decisions involving the hiring and firing of employees); *Ware,* 902 F.2d at 819 (municipality not liable because the principal, who fired the plaintiff, was not the final policymaker on personnel matters as he was not vested with such authority and any decisions he made were reviewable by the school board); *Wulf v. City of Wichita,* 883 F.2d 842, 868–69 (10th Cir. 1989) (municipality not liable because the police chief who fired plaintiff was not the final policymaker of the city's personnel policy nor was the police chief's decision and the basis for it ratified by the city manager who had the legal authority to hire and fire employees). Nevertheless, our decisions also underscore that any review procedure or constraints must be meaningful—as opposed to merely hypothetical—in order to strip an official of "final policymaking" authority. *See Melton [v. City of Oklahoma City],* 879 F.2d [706] 724 n. 24 [ (10th Cir.1989) ] (although not explicitly addressing its significance, charter provision that all personnel decisions were to be made solely based upon "merit and fitness" did not immunize City from liability based upon City Manager's personnel decision); *Flanagan v. Munger,* 890 F.2d 1557, 1569 (10th Cir.1989) ("[F]or all intents and purposes the Chief's discipline decisions are final, and any meaning-ful administrative review [by the City Council or City Manager] is illusory."); *Starrett v. Wadley,* 876 F.2d 808, 818–19 (10th Cir.1989) ("Wadley had final authority to set employment policy as to the hiring and firing of his staff" because City did not offer any\* "meaningful avenues of review").

69 F.3d at 448–49) (footnote omitted). *See Baxter by Baxter,* 26 F.3d at 735 ("It is true that a single act or decision of a final policymaker can establish municipal policy. *Pembaur,* 475 U.S. at 481. A necessary corollary of this point, however, is that it must first be alleged adequately that a defendant is a final policymaker. Only then can a court proceed to the question of whether the single act or decision of that defendant constituted municipal policy.")

### Analysis

 Based upon the uncontroverted facts, the court finds that there is insufficient evidence to conclude that Trish Moore is a final policymaker within the meaning of § 1983. Consequently the BOCC is entitled to summary judgment on her § 1983 claim. Using the general principles suggested by the Tenth Circuit it is clear that Trish Moore was not a final policymaker within the meaning of § 1983. Unlike those cases where the Tenth Circuit has found § 1983 liability based upon a finding that the decision was made by a final policymaker, *see, e.g., Flanagan,* 890 F.2d at 1568–69 (finding § 1983 liability where discipline decisions of police chief "for all intents and purposes" were final "and any meaningful administrative review is illusory"), Trish Moore's decisions were constrained by policies not of her making and were undoubtedly subject to review under clearly established, formal, and apparently meaningful procedures. Boyer offers nothing to suggest that the review process was "illusory." Consequently, the BOCC is entitled to summary judgment on Boyer's § 1983 claim.

IT IS THEREFORE ORDERED that the BOCC's motion to dismiss (Dk. 58) is granted.

IT IS FURTHER ORDERED that the BOCC's motion for summary judgment (Dk. 41) is granted.

The clerk of the court shall enter judgment in favor of the BOCC.