272 Kan. 546 (2001)
35 P.3d 892
LARRY L. REBARCHEK, Appellant,
v.
FARMERS COOPERATIVE ELEVATOR AND MERCANTILE ASSOCIATION OF DIGHTON, KANSAS, and FLOYD G. BARBER, Appellees.
No. 82,662.
Supreme Court of Kansas.
Opinion filed December 7, 2001.
*547 John L. Carmichael, of Wilson, Lee and Gurney, of Wichita, argued the cause and was on the briefs for appellant.
Ward E. Loyd, of Ward Loyd Law Offices, L.L.C., of Garden City, argued the cause, and Craig D. Kershner, of Dighton, was with him on the brief for appellee.
The opinion of the court was delivered by
ALLEGRUCCI, J.:
Larry L. Rebarchek filed suit against his former employer, Farmers Cooperative Elevator and Mercantile Association (Farmers), and supervisor, Floyd G. Barber, alleging retaliatory discharge for the filing of a workers compensation claim. The district court granted summary judgment in favor of Farmers and Barber, and Rebarchek appealed. The Court of Appeals reversed and remanded for trial. Rebarchek v. Farmers Co-op Elevator & Mercantile Ass'n., 28 Kan. App.2d 104, 13 P.3d 17 (2000). This court granted defendants/appellees' petition for review.
Farmers operates five elevator and grain storage and handling facilities. Rebarchek began his employment with Farmers in September *548 1979. In 1983, he fell approximately 60 feet and was seriously injured when the rigging broke as he cleaned the inside of one of Farmers' bins. Rebarchek became branch manager of the Shields, Kansas, facility in July 1986. The Shields facility had six silos with a 665,000 bushel capacity. Rebarchek supervised one employee, Robert Mudd. Rebarchek was responsible for receiving grain at harvest time, maintaining the quality of stored grain, and loading out the grain when it was sold.
Early in 1994, Rebarchek began experiencing recurring back problems for which he sought medical treatment. He was seen on January 18, 1994, by a physician in Dighton, Kansas. In the spring and summer of 1994, he was treated by an orthopedic specialist in Wichita. He was absent from work for an extended period in September 1994. On September 27, 1994, he gave an oral report to Farmers that he had injured his back on January 17, 1994. On November 11, 1994, he gave his employer written notice of a workers compensation claim based on the January 17, 1994, back injury. Reports of the Dighton and Wichita doctors were filed on November 9 and 15, 1994.
On November 16, 1994, Rebarchek told Farmers' secretary that he reinjured his back, Barber was advised on November 17, 1994, and the Form A Employers' Accident Report was made by Farmers the following day. Rebarchek lost no time from work as a result of the November 16 reinjury.
Rebarchek and other Farmers employees drove company pickup trucks to and from work. At the end of the workday on Thursday, November 17, 1994, Barber told Mudd to drive Rebarchek home. He told Rebarchek he could no longer drive the manual transmission company pickup truck assigned for his use. Barber said that he did not want Rebarchek to reinjure his back using the manual transmission. On Friday morning, November 18, Barber announced to all employees that company vehicles could no longer be used for personal business or for commuting to work.
On Monday, November 21, 1994, Barber sent Rebarchek to work at the Alamota facility. The same day he received a letter faxed from Rebarchek's attorney alleging that the reassignment was retaliatory. After receiving the letter, Barber was quite angry. Barber *549 believed that it was on the day he received the faxed letter that he impulsively followed Rebarchek home. Barber was upset and angry. Rebarchek testified that "at his home, Barber told him he was `tired of getting nasty letters' from Rebarchek's attorney and accused him of shipping out `bad grain.'" 28 Kan. App.2d at 107.
Barber returned Rebarchek to his position at the Shields facility on Tuesday, November 22, 1994. Rebarchek remained at Shields until his termination.
On December 5, 1994, Rebarchek requested a hearing on his workers compensation claim.
Rebarchek's failing to maintain the quality of stored grain was the reason given by Farmers for terminating him. The tasks involved in maintaining the quality of the stored grain included checking the temperature of the grain, then turning and blending it if hot spots began to develop. Grain that develops hot spots can become sour, musty, and burned, thus losing value.
Temperatures of stored grain are checked and recorded. The system for tracking temperatures consists of thermocouplers on cables suspended inside each bin. In order to check temperatures, a worker switches on the system and a digital display, then clicks a dial in order to serially display the readings from the thermocouplers. Each reading is written in a "hot spot book." The temperature check at the Shields facility usually took 30 to 35 minutes to complete.
Until grain temperatures are lowered and stabilized after harvests, temperature checks are conducted approximately three times a week. Once the grain temperatures are in acceptable ranges, checks are made at least once a week.
Rebarchek had delegated responsibility for reading the grain temperatures to Mudd. Rebarchek, however, retained ultimate responsibility for the condition of the grain.
On or about September 25, 1994, Farmers first learned of potential problems with the condition of the grain at the Shields facility. Rebarchek was advised by a customer that the grain was bad. Rebarchek assured Barber that "they had simply run through a pocket of bad wheat." Wheat samples furnished to Barber by Rebarchek were tested and given acceptable grades.
*550 In spite of being alerted in late September 1994 to potential problems with the condition of stored grain in the Shields facility, Rebarchek did not monitor it. In February 1995, he discovered that a bin that was supposed to be empty was filled with grain. When Rebarchek investigated, he found that grain temperatures had not been checked and that grain had not been properly moved or turned. He discovered corn with a temperature of 144. The preferred temperature range for stored corn is 40 to 60.
On March 21, 1995, Rebarchek and Mudd received written reprimands. Rebarchek was reprimanded "for his lack of management of the grain at the Shields elevator." The reprimand stated:
"Because of inadequate care in reading the hot spot detecting system and turning the grain and blending the grain as needed to maintain it in a marketable condition, we have suffered losses in both wheat and corn. There has been a signifigant [sic] loss in the wheat and now we will have even a bigger loss in corn as there are 125,000 bus. out of condition."
Handwritten on the lower half of the page is the following: "Larry claims only 80,000 bu corn out of condition." The monetary loss was not determined until the grain was shipped, inspected and tested, the purchaser's vouchers were received by Farmers, and the grain certificates were returned. Farmers first shipment of "hot corn" was made in April 1995, and its estimate of the total monetary loss was based on the figures from that partial shipment (30,000 of 140,000 bushels). Farmers estimated that its loss would total approximately $80,000.
On March 24, 1995, Rebarchek underwent back surgery. He returned to work on April 17, 1995. His doctor imposed the following restrictions: "He is released for light duty with no lifting more than 40 lbs., no bending or twisting of the back more than halfway, no climbing ladders. He may sit, stand or walk for 2 hours at a time with breaks. Hopefully, these will be temporary restrictions." Rebarchek's activities had not been restricted before the surgery.
One week after Rebarchek returned to work, his employment was terminated by Farmers. Mudd also was discharged on April 24, 1995.
*551 The Court of Appeals found that there was a genuine issue of material fact that precluded the entry of summary judgment against Rebarchek and remanded the case for trial.
In arguing that the Court of Appeals incorrectly concluded that Rebarchek was entitled to test his case before a jury, defendants raise questions about the burden of proof and using a burden-shifting approach as well as whether Rebarchek's evidence raised a genuine issue of material fact.
Burden of proof. The burden of proof borne by a plaintiff alleging retaliatory discharge due to his or her filing a workers compensation claim was the subject of a certified question in Ortega v. IBP, Inc., 255 Kan. 513, 874 P.2d 1188 (1994). This court said:
"In Kansas, claimants are required to prove a claim for retaliatory discharge by clear and convincing evidence. Clear and convincing evidence is not a quantum of proof but rather a quality of proof. A party having the burden of proving a retaliatory discharge from employment for having filed a workers compensation claim must establish that claim by a preponderance of the evidence, but the evidence must be clear and convincing in nature. It is clear if it is certain, unambiguous, and plain to the understanding. It is convincing if it is reasonable and persuasive enough to cause the trier of facts to believe it." 255 Kan. 513, Syl. ¶ 2.
Defendants complain that the Court of Appeals misidentified the burden of proof in Syl. ¶ 4 in saying that "[t]he burden of proof is on the complainant to prove by a preponderance of the evidence...." Defendants failed to note Syl. ¶ 2, which states: "The plaintiff must prove a claim for retaliatory discharge by a preponderance of the evidence, but the evidence must be clear and convincing in nature." 28 Kan. App.2d 104, Syl. ¶ 2.
A question that presents itself in this case is whether a clear and convincing quality of proof standard should be required in determining on a motion for summary judgment whether there is a genuine issue of material fact. In Baumann v. Excel Industries, Inc., 17 Kan. App.2d 807, 845 P.2d 65, rev. denied 252 Kan. 1091 (1993), a panel of the Court of Appeals, including now-Justice Davis, gave thoughtful consideration to this question and concluded that the clear and convincing evidence standard need not be met at a summary judgment stage of the proceedings:

*552 "We conclude the application of a clear and convincing evidence standard at the summary judgment stage is unique to libel cases because First Amendment rights are at issue. In Ruebke, 241 Kan. at 602, the court stated:
`To provide added protection to the press from libel suits, the United States Supreme Court recently changed the direction of summary judgment under the federal rules. In a libel action brought by a "public figure," that individual is required under the First Amendment to prove by clear and convincing evidence that the defendant acted with "actual malice, a knowing or reckless disregard of the truth." That the clear and convincing standard of proof of malice applies at the summary judgment stage was decided in Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 91 L. Ed.2d 202, 106 S. Ct. 2505 (1986). The court stated:
"[T]he inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits.... [W]here the First Amendment mandates a `clear and convincing' standard, the trial judge in disposing of a directed verdict motion should consider whether a reasonable factfinder could conclude, for example, that the plaintiff had shown actual malice with convincing clarity." 477 U.S. at 252.'
"Federal court decisions interpreting the federal code of civil procedure are highly persuasive in applying the Kansas Code of Civil Procedure, which is based on the federal code. See Stock v. Nordhus, 216 Kan. 779, 782, 533 P.2d 1324 (1975). However, in the context of fraud, the Kansas Supreme Court has stated that, although a party alleging fraud must prove it by clear and convincing evidence, `a party resisting a motion for summary judgment need not present this quantum of evidence in order to succeed in opposing the motion.' Gorham State Bank v. Sellens, 244 Kan. 688, 691, 772 P.2d 793 (1989). The Supreme Court has subsequently opined that clear and convincing evidence is a quality and not a quantum of proof. Barbara Oil Co. v. Kansas Gas Supply Corp., 250 Kan. 438, 448, 827 P.2d 24 (1992).
"We conclude the district court erred in requiring Baumann to meet the clear and convincing evidence standard at that stage of the proceedings." 17 Kan. App. 2d at 815-16.
We find the reasoning of Gorham and Baumann to be sound and conclude Rebarchek need not meet the clear and convincing standard at the summary judgment stage of the proceedings.
Burden-shifting approach. In Ortega, the court also discussed the burden-shifting approach to proof of employment cases:
"Kansas has adopted the McDonnell Douglas burden-shifting analysis for employment discrimination actions. Woods v. Midwest Conveyor Co., 231 Kan. 763, 648 P.2d 234 (1982). The burden *553 `is on the complainant to prove by a preponderance of the evidence that the respondent is guilty of a discriminatory practice. Initially, the complainant must present a prima facie case of discrimination. Then the burden of going forward with the evidence shifts to respondent and this burden may be discharged by evidence of a legitimate, nondiscriminatory reason for respondent's conduct. Once the respondent discharges this obligation, the complainant must continue with the burden of proving by a preponderance of the evidence that the reasons offered by respondent were merely a pretext for discrimination.' 231 Kan. 763, Syl. ¶ 2.
See Beech Aircraft Corp. v. Kansas Human Rights Comm'n, 254 Kan. 270, 864 P.2d 1148 (1993). To establish a prima facie case of discrimination, the plaintiff must show that he or she is a member of a racial minority, that the employer was seeking applicants for a position for which he or she applied and was qualified, that he or she was rejected for the position despite his or her qualifications, and that after rejecting the plaintiff the employer continued to seek applicants with his or her qualifications. McDonnell Douglas, 411 U.S. at 802.
"A somewhat modified burden-shifting analysis is also applied in cases where a public employee is terminated after having exercised his or her right to free speech protected by the First Amendment. Larson v. Ruskowitz, 252 Kan. 963, 850 P.2d 253 (1993). In such cases, the public employee must first make a prima facie showing that his or her protected communication was a motivating factor for the termination (or suspension from employment), and upon such a showing the burden shifts to the governmental employer to produce evidence it would have terminated or suspended the employee even without the communication. 252 Kan. 963, Syl. ¶ 4. The Larson court distinguished cases involving violation of a public employee's free speech rights from whistle-blowing retaliatory discharge cases, noting that whistle-blowing and workers compensation retaliatory discharge actions protect employees in both the public and private sectors, while violation of free speech actions only are available to public employees." 255 Kan. at 526-27.
Based on this court's use of the burden-shifting analysis for discrimination and free speech cases, "Judge Earl E. O'Connor of the United States District Court for the District of Kansas has concluded that Kansas would utilize the burden-shifting analysis in workers compensation discharge cases. Robinson v. Wilson Concrete Co., 913 F. Supp. 1476, 1483 (D. Kan. 1996)." 28 Kan. App. 2d at 109-10. The Court of Appeals stated that the parties agreed that the analysis was appropriate and held that it applied. 28 Kan. App.2d at 110. We agree.
The Court of Appeals adopted the elements of a prima facie claim for retaliatory discharge for filing a workers compensation *554 claim as set out in Sanjuan v. IBP, Inc., 160 F.3d 1291, 1298 (10th Cir. 1998). 28 Kan. App.2d at 109. Those elements are: (1) The plaintiff filed a claim for workers compensation benefits or sustained an injury for which he or she might assert a future claim for such benefits; (2) the employer had knowledge of the plaintiff's workers compensation claim injury; (3) the employer terminated the plaintiff's employment; and (4) a causal connection existed between the protected activity or injury and the termination. Petitioners do not directly question the statement of the elements made by the Court of Appeals. They argue, however, that Rebarchek needs to show that his job performance was satisfactory in order to make out a prima facie case. That argument will be addressed later in this opinion.
The differences between the district court's view of summary judgment and that of the Court of Appeals begins with the fourth element of the prima facie case. There is no dispute that Rebarchek presented sufficient evidence on the first three elements of a prima facie case. On the fourth element, the district court found that Rebarchek failed to come forward with sufficient evidence of a causal connection between his workers compensation claim and his discharge.
Summary judgment. The settled principles regarding summary judgment are as follows:
"Summary judgment is appropriate when the pleading, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. [Citation omitted.]" Bergstrom v. Noah, 266 Kan. 847, 871-72, 974 P.2d 531 (1999).
On the fourth element of Rebarchek's prima facie case, that a causal connection existed between the protected activity or injury *555 and the termination, the district court first found "no correlation between the time of filing of the original compensation claim and the discharge seven months later." Proximity in time between the claim and discharge is a typical beginning point for proof of a causal connection. Marinhagen v. Boster, Inc., 17 Kan. App.2d 532, 540, 840 P.2d 534 (1992). Showing proximity in time, however, is not the sole means of showing a causal connection. The Tenth Circuit has held that unless the employer's adverse action is closely connected in time to the protected conduct, the claimant will need to produce additional evidence in order to show a causal connection. Anderson v. Coors Brewing Co., 181 F.3d 1171, 1179 (10th Cir. 1999). Citing Marx v. Schnuck Markets, Inc., 76 F.3d 324, 329 (10th Cir. 1996), cert. denied 518 U. S. 1019, the Court of Appeals observed that a plaintiff in Rebarchek's position "can avoid summary judgment by showing a pattern of retaliatory conduct stretching from the filing of a workers compensation claim to termination." 28 Kan. App.2d at 111.
The Court of Appeals viewed Rebarchek's evidence of a pattern of retaliatory conduct sufficient to raise a genuine issue of material fact regarding a causal connection. The phrase used by the Court of Appeals in describing plaintiffs proof was that he had "assembled enough bits and pieces of circumstantial evidence." 28 Kan. App.2d at 111. The Court of Appeals listed the bits of evidence mustered by plaintiff:
1. Barber was angry;
2. Barber followed Rebarchek home after the workers compensation claim was filed;
3. Barber reassigned Rebarchek to the Alamota facility;
4. Barber prevented Rebarchek from driving the company vehicle previously assigned to him;
5. Barber was angry that Rebarchek refused cash offered in lieu of pursuing workers compensation claim;
6. employees with similar or worse job performances were not terminated; and
7. Rebarchek was fired within a week of his post-surgery release to return to work that included restrictions on his activities.
*556 In their petition for review, defendants assert that items 1 through 5 related to Rebarchek's mishandling of stored wheat and all occurred within the space of 2 days, November 16 and 17, 1994. The record does not bear out their assertion. The record shows that near the end of September 1994 a customer reported purchasing bad wheat from the Shields facility, Rebarchek told Barber the bad wheat was from an anomalous pocket, and tested wheat samples were acceptable. Occurrences of November 16 and 17 are not linked in the record with bad wheat.
With regard to the plaintiff's 1994 injury and claim, the record shows that on November 11 Rebarchek gave Farmers written notice of a workers compensation claim based on his January 17 back injury, his doctors' reports were filed on November 9 and 15, Rebarchek told Farmers' secretary on November 16 that he reinjured his back, Barber was advised on November 17 and the Form A Employers' Accident Report was made by Farmers on November 18.
With regard to the employer's actions, the record shows that Barber's anger coincided with Rebarchek's reinjury and the filing of his workers compensation claim. At that time, Barber cancelled Rebarchek's company vehicle privileges, transferred Rebarchek from his supervisory position at the Shields facility to another facility, angrily followed him home from work, and expressed anger to another worker that Rebarchek refused to take cash instead of filing for workers compensation benefits.
Four months later, on March 24, 1995, Rebarchek underwent back surgery. On April 17, he was released to return to work with restrictions on his activities. On April 24, he was terminated.
The Court of Appeals viewed this evidence as constituting a pattern of retaliatory conduct that began mid-November 1994 with Rebarchek's reinjury and the filing of his workers compensation claim and culminated on April 24, 1995, in actual discharge. The passage of slightly more than 5 uneventful months before Rebarchek was discharged probably approaches the limit that would be recognized as part of a pattern for the purpose of establishing a causal connection between the protected activity and termination.
*557 In this case, Farmers' stated reason for firing Rebarchek arose during the months between Barber's initial angry actions and Rebarchek's termination. In February 1995, the hot corn was found. On March 21, 1995, Rebarchek and Mudd received written reprimands for failing to maintain the condition of stored grain.
Defendants argue that plaintiffs poor job performance precludes him from establishing the fourth element of a prima facie case of retaliatory discharge. They cite several Court of Appeals cases in which a treatise was quoted on the use of circumstantial evidence for proving retaliation. In Marinhagen, 17 Kan. App.2d at 40, the Court of Appeals stated:
"Plaintiffs' case perhaps rests to a great degree upon circumstantial evidence as do most discrimination and retaliation cases. 2A Larson's Workmen's Compensation Law § 68.36(c) (1992) suggests:
`Ordinarily the prima facie case must, in the nature of things, be shown by circumstantial evidence, since the employer is not apt to announce retaliation as his motive. Proximity in time between the claim and the firing is a typical beginning-point, coupled with evidence of satisfactory work performance and supervisory evaluations.'"
The prima facie case, as that phrase is used in the quote from the treatise, is not a prima facie case as set out in our burden-shifting analysis. With the burden-shifting approach utilized by the Court of Appeals, evidence of the claimant's job performance, negative and positive, is not a part of his or her prima facie case but rather is the subject of the employer's proof and the plaintiff's response. A claimant's "prima facie case is not an onerous burden under the McDonnell Douglas burden-shifting scheme." Robinson v. Wilson Concrete Co., 913 F. Supp. 1476, 1483 (D. Kan. 1996).
In the present case, the legitimate, nonretaliatory reason given by defendants for firing Rebarchek was that he failed to maintain the condition of stored grain, causing Farmers to lose money on the sale of a substantial quantity of out-of-condition grain.
With the burden shifted back to him, Rebarchek presented evidence tending to support the proposition that defendants' stated reason for discharging him on April 24, 1995, was merely a pretext. Plaintiff points to evidence that defendants knew how much grain was out-of-condition at the time, March 21, 1995, when he and *558 Mudd were reprimanded in writing. The defendants would explain not firing Rebarchek in March before his back surgery by stating that they did not know the amount of the financial loss until late April, when Rebarchek was discharged. Rebarchek's position is that Farmers may not have known the exact dollar loss at the time of the written reprimand, but it did know at that time the quantity of spoiled grain so that an estimate of the financial loss could be made. Rebarchek also points out that only an approximate dollar loss was known at the time he was fired. Barber's affidavit states that shipments of the spoiled grain were by contract not to be completed until July 15, 1995, and the actual dollar value of the loss was not available until "after the grain was shipped, inspected and tested, the [buyer's] vouchers received, and the Grain Certificates returned." The grain was purchased by an ethanol-producing firm.
Rebarchek presented evidence that other Farmers employees with somewhat similar performance deficiencies were not terminated. There is evidence that another branch manager, Rick Torson, was given a written reprimand for failing to follow bin entry procedures. As a result of that failure, an employee was killed. On two other occasions, Torson allowed wheat and milo to be mixed together at the Alamota facility. Those two grains cannot be salvaged by separating. One of those incidents involved between 75,000 and 100,000 bushels of grain. Torson was not fired for these failures. In late November 1994, the elevator supervisor, Henry Coleman, was directed to keep watch on the Shields facility, including the grain temperatures there. Coleman did not do so but was not fired for that failure.
The Court of Appeals concluded that the evidence presented by Rebarchek for the purpose of showing that Farmers' stated reason for his termination was unworthy of belief as the actual reason for why he was discharged raised genuine issues of material fact on the existence of pretext. 28 Kan. App.2d at 112. Although, Rebarchek's admittedly poor job performance supports Farmers' position, we agree with the Court of Appeals that he is entitled to test his case before a jury by virtue of his coming forward with evidence that raises genuine issues concerning defendants' motivation.
*559 The Court of Appeals concluded that events predating the limitations period can provide a basis for recovery on a theory of a continuing pattern of discrimination. Rebarchek filed this action on April 22, 1997. Given the 2-year statute of limitations, the district court concluded that "[c]auses of action upon any claimed act occurring prior to April 19, 1995 are barred, and may not be maintained." The district court stated that all allegations of conduct occurring before the limitation period "should be stricken and dismissed."
The Court of Appeals reversed the trial court's ruling on this issue. The Court of Appeals' comments are concise and correct:
"Our Supreme Court has recognized that, in the context of discriminatory acts covered by the Kansas Acts Against Discrimination, K.S.A. 44-1001 etseq., events predating the period of limitations may provide a basis for recovery because they were part of a continuing pattern of discrimination. Evidence of such events also may be admissible to prove that the ultimate termination sued upon was motivated by unlawful discrimination. See Woods, 231 Kan. at 765.
"The same analysis applies with equal force to a common-law action for retaliatory discharge for filing a workers compensation claim. Rebarchek has come forward with adequate evidence to proceed to trial on the theory that defendants' actions constituted a continuing pattern of discrimination, and the jury may further consider the evidence of events predating the limitations period for whatever weight it elects to afford it on the issue of discriminatory intent." 28 Kan. App. 2d at 112-13.
Defendants contend that evidence of defendants' pre-April 22, 1995, conduct should not even be admissible and certainly should not be a basis for recovery of damages. Defendants' argument is without merit.
The district court concluded that Supervisor Barber could not be held personally liable for Rebarchek's termination because there was no employment relationship between Barber and Rebarchek. The Court of Appeals concluded that a supervisor who has sole discretion to fire an employee on behalf of the employer can be held directly liable for retaliatory discharge so that his liability will be joint and several with that of the employer. 28 Kan. App.2d at 117. The issue had not previously been adjudicated by Kansas courts. Upon review of Kansas case law, the Court of Appeals concluded that supervisor liability would be consistent with *560 the principles announced in earlier cases. 28 Kan. App.2d at 113-17.
Defendants contend that the Court of Appeals' decision is opposite the majority and better-reasoned rule. They cite 82 Am. Jur. 2d, Wrongful Discharge, § 231, and a number of cases from other jurisdictions.
The encyclopedia reference does not support defendant's position that individual liability is the minority rule. The article states that there is a difference of authority on the question of individual liability for acts undertaken within the scope of employment. A federal case applying Michigan law is cited for no liability; a federal case applying New Jersey law and a West Virginia case are cited for liability. 82 Am Jur.2d § 231, p. 942.
The cases from other states and federal courts cited by defendants are similarly inconclusive. The great majority of those cases involve statutory causes of action for employment discrimination or wrongful termination. Individual liability in those cases is a matter of construction of the statutory language. Because the Kansas cause of action for retaliatory discharge for filing a workers compensation claim is not statutorily created, other courts' interpretations of statutes offer little or no guidance.
Several of the cases cited by defendants have common-law causes of action for wrongful discharge pled along with statutory ones for wrongful discharge. For instance, in Reno v. Baird, 18 Cal. 4th 640, 76 Cal. Rptr.2d 499, 957 P.2d 1333 (1998), plaintiff alleged termination in violation of statutory prohibitions as well as a cause of action for discharge in violation of public policy. The court concluded that there was no individual liability under the statute. Turning to the common-law cause of action, the court concluded: "It would be absurd to forbid a plaintiff to sue a supervisor under the FEHA, then allow essentially the same action under a different rubric." 18 Cal. 4th at 664.
In reaching its decision that a supervisor is potentially liable jointly and severally with the employer for a workers compensation retaliatory discharge, the Court of Appeals began its analysis with Murphy v. City of Topeka, 6 Kan. App.2d 488, 630 P.2d 186 (1981). Murphy sued not only his employer but also three individual *561 supervisors, alleging willful and wanton misconduct. The panel, which included Justice Herd, recognized as a matter of public policy that the discharge of an employee in retaliation for filing a workers compensation claim is actionable at law. 6 Kan. App.2d 488, Syl. ¶ 7. The potential liability of the supervisors was not discussed, but the Murphy panel held that plaintiff could maintain his action. As noted by the Court of Appeals in the present case, Murphy has been read, in dicta, by a federal court as requiring willful and wanton conduct for individual liability. 28 Kan. App.2d at 116-17 (citing Edwards v. Western Mfg., Div. of Mont. Elev., 641 F. Supp. 616, 617 [D. Kan. 1986]). That reading was rejected by the Court of Appeals in the present case: "We read Murphy's mention of its three supervisors' lack of authority for their actions merely as a function of the public employment context and the necessity of addressing the possibility of a governmental immunity defense. See 6 Kan. App.2d at 494-95." 28 Kan. App.2d at 116.
Although individual liability was not an adjudicated issue in Murphy, Marinhagen, or Riddle v. Wal-Mart Stores, Inc., 27 Kan. App. 2d 79, 998 P.2d 114 (2000), the Court of Appeals viewed those cases as indicating no prohibition on individual employee liability. On the other side of the scale in the Court of Appeals' analysis was Barber's asserted lack of an employment relationship between himself and Rebarchek. 28 Kan. App.2d at 115. On this point, the Court of Appeals stated: "Although it is always true that an entity employer and its discharged employee must have been parties to the former employment relationship, it is not necessarily true that the supervisor who actually discharged the employee was also a party to that relationship." 28 Kan. App.2d 115.
The Court of Appeals' resolution of the issue was to approve individual liability, as indicated by prior cases, but to limit potential liability in accordance with the status of the supervisor in relation to the discharged employee. In this regard, the Court of Appeals determined that the potential for in lividual supervisor liability "should turn on whether the supervisor was free to exercise his or her sole discretion to arrive at the termination decision." 28 Kan. App.2d at 115.
The opposite view is expressed in Buckner v. Atlantic Plant Maint., 182 Ill.2d 12, 694 N.E.2d 565 (1998), where the Illinois Supreme Court stated:

*562 "Logically speaking, only `the employer' has the power to hire or fire an employee. Obviously, an agent or employee of the employer may carry out that function on the employer's behalf, but it is still the authority of the employer which is being exercised. If the discharge violated public policy, it is the employer who is rightly held liable for damages. The purpose underlying the recognition of retaliatory discharge actions is therefore fully served by allowing actions only against the employer.
"The plaintiff contends, however, that the `deterrent effect' of the tort will be diminished if the employee or agent who `participated' in the firing is not also subject to liability. Imposing liability for retaliatory discharge on parties other than the employer is not necessary. The power to discharge rests with the employer. Subjecting the employer to liability for retaliatory discharge therefore acts to deter discharges which violate public policy. The plaintiff suggests that allowing other parties to be held liable is necessary because it may be those other parties who `devise the plan' to discharge the plaintiff for an unlawful reason. Even in the plaintiff's scenario, however, the discharge is still authorized by the employer. Moreover, from a practical perspective, if an agent or employee induces the employer to discharge another employee for an unlawful reason, and the employer is held liable for retaliatory discharge as a result, it is likely that the employer itself will act to `deter' that agent or employee from repeating such conduct.
"Limiting the potential defendants in a retaliatory discharge action to employers is particularly appropriate in a case such as this where the alleged unlawful reason for the termination was the plaintiff's pursuit of workers' compensation benefits. Under the Workers' Compensation Act, workers' compensation benefits are paid to an injured employee by the employer. See 820 ILCS 305/11 (West 1996). Presumably, the intent of an employer who adopts a policy of firing employees for seeking workers' compensation benefits is to avoid having to pay such benefits to employees. Accordingly, it is only the employer who has a `motive' to fire an employee for seeking workers' compensation benefits. The retaliatory discharge claim is therefore properly brought against the employer.
"[T]he power to hire and fire employees is ultimately possessed only by the employer. Consequently, the tort of retaliatory discharge may be committed only by the employer." 182 Ill.2d at 21-22.
We find the above rationale very persuasive and decline to impose liability for retaliatory discharge of an employee on a supervisor. We conclude that only the employer is liable for retaliatory discharge.
Finally, defendants question Rebarchek's maintaining suits in both state and federal courts, alleging that he was discharged in retaliation for filing a workers compensation claim. Defendants argue that if the "elements and standards" of the Kansas Act Against *563 Discrimination (KAAD), K.S.A. 44-1001 et seq., are to be applied in a retaliatory discharge action, a claimant should have to elect to file either a KAAD or a retaliatory discharge claim. They assert that one would duplicate the other.
Rebarchek filed both state and federal actions. In the federal court action, he alleged violations of the Americans with Disabilities Act (ADA) and the KAAD. Farmers sought and was granted summary judgment by the district court on the principal ground that Rebarchek's back injury was not a disability within the meaning of the ADA. Rebarchek v. Farmers Co-op Elevator and Mercant., 60 F. Supp.2d 1145 (D. Kan. 1999), affd 202 F.3d 282 (10th Cir. 2000). With regard to Rebarchek's KAAD claim, the federal district court stated: "[T]he basis of this claim is the same as the ADA claim and the relevant KAAD provisions are virtually identical to the ADA, [thus] summary judgment is likewise appropriate on plaintiffs KAAD claim." 60 F. Supp.2d at 1153.
The present action does not center on the question of whether Rebarchek's back injury is a disability. The central question in this case is whether Rebarchek was fired from his job on account of his workers compensation injury and claim. There is no merit to the defendants' argument.
We conclude that the Court of Appeals erred in reversing the district court's decision that a supervisor is not liable for the retaliatory discharge of an employee. In all other respects, the Court of Appeals' decision is affirmed.
The judgment of the Court of Appeals is affirmed in part and reversed in part. The judgment of the district court is affirmed in part and reversed in part, and the case is remanded to the district court for trial.