**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 8, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

DAVID YINGER,

    Plaintiff - Appellant,

v.

POSTAL PRESORT, INC.,

    Defendant - Appellee.

No. 16-3239
(D.C. No. 6:15-CV-01106-JTM)
(D. Kan.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **TYMKOVICH**, Chief Judge, **McKAY** and **LUCERO**, Circuit Judges.
_____

David Yinger appeals from a grant of summary judgment in favor of Postal

Presort, Inc. ("PPI") on his disability discrimination and retaliatory discharge claims.

Exercising jurisdiction under 28 U.S.C. § 1291, we reverse and remand for further

proceedings.

---

[*] After examining the briefs and appellate record, this panel has determined
unanimously to honor the parties' request for a decision on the briefs without oral
argument. See Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore
submitted without oral argument. This order and judgment is not binding precedent,
except under the doctrines of law of the case, res judicata, and collateral estoppel. It
may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1
and 10th Cir. R. 32.1.

**I**

PPI is a Kansas company that provides printing and postal services. Yinger began working for PPI in 2006 as a handyman, machine operator, and backup driver. Although he has a serious heart condition that requires him to have a pacemaker, Yinger fulfilled his job duties without any apparent restrictions.

On July 21, 2012, the Occupational Safety and Health Administration ("OSHA") conducted a surprise inspection of PPI to investigate possible asbestos-related violations. There is no evidence Yinger reported PPI to OSHA; however, Bryan Pulliam, the President and owner of PPI, concedes he believed Yinger filed such a report, thereby triggering the investigation.

Following the inspection, Pulliam issued two memoranda. In the first, which was initially sent as an email to PPI management, Pulliam referred to Yinger by name and described his discomfort with "having an employee [Yinger] on payroll doing maintenance work." He then announced that PPI would no longer perform such maintenance activities with its own staff. Pulliam stated his decision was "not intended" and "should [not] be construed . . . to be reactive to the OSHA visit," but in the same email, he admitted the inspection had "expedited" the policy change.

The memorandum to management was posted in PPI's breakroom the following Monday, along with a second memorandum from Pulliam to all employees stating that the OSHA inspection had been "trumped up by someone intending to do [PPI] harm," the complaints about asbestos seemed "contrived just to cause trouble," and employees should be concerned "about unknown worms among us, if they are

still here, who would attempt intentional harm instead of coming forward with trust." As a result of the investigation, OSHA fined PPI $8,400. Yinger testified that Pulliam treated him well before the OSHA inspection but was cool to him afterward.

In late 2012, Yinger underwent a procedure to replace the battery in his pacemaker. He developed an infection, and PPI granted him twelve weeks of unpaid leave under the Family and Medical Leave Act ("FMLA"). The leave period was due to expire on April 17, 2013. However, on March 11, Yinger informed PPI's human resource professional, Evelin Nicholes, that his doctor anticipated Yinger would not be able to return to work until April 23. Yinger did not expressly ask for an additional week of leave, but he testified that what he told Nicholes was "just as much saying that [he] need[ed] another week." Nicholes informed Pulliam of her conversation with Yinger, to which Pulliam responded, "[W]e'll deal with that when the time comes." There is no evidence in the record of anyone at PPI giving Yinger any further response to his March 11 notice.

Yinger did not return to work on April 17, his original return-to-work date. On April 18, Nicholes sent an email to Pulliam asking him how he wanted "to handle the situation now that David Yinger has not returned from FMLA as scheduled." She noted that PPI had not "received anything from David's doctor or a written extension request," and she suggested a "call to the lawyer . . . to see how best to terminate without retribution."

3

Pulliam responded the following day: "Silence until the end of the month, then just send him the obligatory COBRA information." He also told Nicholes to refer Yinger directly to him with any questions, and that "in light of shifting work load, there [was] not a current position open for him," although Yinger was "welcome to reapply." That same week, Yinger contacted his supervisor asking if PPI was ready for him to return to work. His supervisor instructed him to contact Pulliam before clocking in.

On April 23, Yinger's doctor released him to work without restriction. While in the doctor's waiting room, Yinger received a call from Nicholes, who told him that he would not be coming back to work for PPI. In an email to Nicholes, Pulliam stated that he had "no need to visit with David Yinger," that PPI was "currently overstaffed," and that Nicholes should inform Yinger that he was "welcome to put in a new application, fully filled out as a new applicant."

Yinger went to PPI on April 23 and asked Nicholes for a written termination letter so he could apply for unemployment benefits. Nicholes relayed the request to Pulliam, who replied by email: "Is he crazy? He thinks I'm going to sign something that says I terminated him?" He later sent a second email stating: "[W]e are putting nothing on paper. He used to be an employee, and now is not. That's the end of it." Yinger was informed that it was not in Pulliam's "good interest" to give him a letter, that Pulliam did not have time to talk to him that day, and that he was welcome to reapply for a position.

Yinger never filled out a job application. Instead, he filed suit against PPI, asserting a failure-to-accommodate claim under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112, and a claim for retaliatory discharge under Kansas law. He alleged that the company had failed to provide reasonable accommodations in the form of an extra week of unpaid leave and had unlawfully discharged him based on Pulliam's belief that Yinger reported PPI to OSHA in July 2012.

The district court granted summary judgment in favor of PPI on both claims. It held that Yinger's heart condition was not a disability under the ADA and that, even if it were, PPI had effectively granted his leave request through April 23. The court further cited "uncontroverted evidence" that PPI would have faced an undue hardship by allowing Yinger to return to work. As to the retaliatory discharge claim, the court concluded that PPI had terminated Yinger because it needed to reduce staff, and that there was no evidence suggesting a causal connection between the termination and the earlier OSHA investigation. Yinger timely appealed.

## II

We review the district court's grant of summary judgment de novo. Campbell v. Gambro Healthcare, Inc., 478 F.3d 1282, 1287 (10th Cir. 2007). Summary judgment is appropriate if, viewing the evidence in the light most favorable to Yinger, we determine that "there is no genuine dispute as to any material fact and [PPI] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Campbell, 478 F.3d at 1287.

5

## A

Yinger argues that the district court erred by concluding he did not have an actual disability under the ADA, that PPI granted his leave request, and that the company could not hold his job open because of an undue hardship. We agree.

The ADA requires employers to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability," unless the accommodations would impose an undue hardship. 42 U.S.C. § 12112(a), (b)(5)(A). When a claim alleging a violation of the ADA is based on circumstantial evidence, we apply the McDonnell Douglas[1] burden-shifting framework. Williams v. FedEx Corp. Servs., 849 F.3d 889, 896 (10th Cir. 2017). Under that framework, a plaintiff must first establish a prima facie case of discrimination by showing that: "(1) he is disabled (or perceived as disabled) as defined by the ADA, (2) he is qualified to perform the essential functions of his job with or without reasonable accommodation, and (3) he suffered discrimination as a result of his disability." Id. (quotation omitted). The failure to provide reasonable accommodations constitutes disability discrimination under the ADA. Smith v. Midland Brake, Inc., 180 F.3d 1154, 1178 n.12 (10th Cir. 1999) (en banc).

If Yinger establishes a prima facie case, "the burden of production shifts to [PPI] to present evidence either (1) conclusively rebutting one or more elements of [Yinger's] prima facie case or (2) establishing an affirmative defense, such as undue

---

[1] McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973).

hardship." Id. at 1179. Once PPI meets this burden, it is entitled to summary judgment "unless [Yinger] then presents evidence establishing a genuine dispute regarding the affirmative defenses and/or rehabilitating any challenged elements of his . . . prima facie case." Id.

**1**

The district court concluded that Yinger failed to establish a prima facie case of discrimination because there was no evidence he was disabled within the meaning of the ADA.[2] The ADA defines "disability" as: "(A) a physical or mental impairment that substantially limits one or more major life activities . . . ; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1).[3] In this case, Yinger presented uncontroverted evidence that he has a heart condition, which requires him to have a pacemaker in order to live. He further alleged that this condition interferes with his ability to lift, stand, and walk distances. A reasonable jury could therefore conclude Yinger has a physical impairment that substantially limits one or more major life activities. See 29 C.F.R. § 1630.2(h)(1) (defining "physical impairment" as "[a]ny physiological disorder or condition . . . or anatomical loss affecting one or more body systems, such as . . .

---

[2] PPI does not dispute that Yinger is qualified to perform the essential functions of his job with or without accommodation.

[3] PPI argues that Yinger only alleged a "regarded as" disability claim. The record refutes this assertion. Yinger's complaint asserted that he had an actual disability, which substantially limited his major life activities of walking, standing, and lifting. And in the Pretrial Order, he specifically claimed that his heart condition constituted a disability under the ADA.

7

[the] cardiovascular [system]"); § 1630.2(i)(1) (defining "major life activities" under the ADA to include walking, standing, lifting, the operation of circulatory/cardiovascular functions, and "the operation of an individual organ within a body system").

The district court determined that Yinger was not disabled because he performed his job without any need for accommodation. But under the 2008 amendments to the ADA, "[t]he determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures." § 12102(4)(E). Although the court briefly noted this rule, it failed to consider the effect of Yinger's heart condition without his pacemaker. It further erred by questioning Yinger's entitlement to reasonable accommodations on the ground that his heart-related infection was merely temporary. Even temporary impairments can qualify as disabilities within the meaning of the ADA. See § 12102(3)(B); § 1630.2(j)(1)(ix). More to the point, however, the infection was a side effect of treatment for Yinger's permanent heart condition and therefore relevant to an analysis of that condition's limiting effects and Yinger's need for reasonable accommodation. See § 1630.2(j)(4)(ii) (stating that the "negative side effects of . . . burdens associated with following a particular treatment regimen . . . may be considered when determining whether an individual's impairment substantially limits a major life activity").

8

**2**

Not only does the evidence, viewed in Yinger's favor, show that he had an actual disability within the meaning of the ADA, but it also demonstrates that he notified PPI of his need for a facially reasonable accommodation.

To trigger the ADA's protections, an employee's request for accommodation "must make clear that the employee wants assistance for his or her disability." E.E.O.C. v. C.R. Eng., Inc., 644 F.3d 1028, 1049 (10th Cir. 2011) (emphasis and quotation omitted). The request need not be in writing. Id. Nor must it "formally invoke the magic words 'reasonable accommodation.'" Id. (quotation omitted). "We have [further] held that, under the appropriate circumstances, an allowance of time for medical care or treatment may constitute a reasonable accommodation." Id. at 1048 (brackets and quotation omitted).

Both Pulliam and Nicholes knew Yinger had "longstanding heart problems." Nicholes also knew, based on her March 11 conversation with Yinger, that Yinger might need an extra week of unpaid leave to recover from his heart-related infection. See id. at 1049 ("[T]he employer must know of both the disability and the employee's desire for accommodations for that disability." (quotation omitted)). We therefore agree with the district court that Yinger's March 11 conversation with Nicholes constituted an adequate request for reasonable accommodations.

However, we disagree with the court's determination that PPI "effectively granted" Yinger's request for an additional week of leave. It is unclear on what evidence the court based this finding. Although Pulliam testified that he granted

9

Yinger's leave request and was willing to give him up to a year of leave, that testimony is controverted by: (1) PPI's failure to hold open Yinger's position; (2) Pulliam's statements that PPI "took no stance, nor made any response" in relation to Yinger's request for additional leave; (3) testimony by Pulliam and Nicholes that Yinger had caused his termination by not returning to work after the expiration of his FMLA leave; (4) the absence of any evidence suggesting Yinger was informed that PPI had decided to extend his leave; and (5) emails between Pulliam and Nicholes indicating they had decided to terminate Yinger prior to April 23.

Moreover, the district court overlooked evidence that PPI failed to participate in an interactive process to determine reasonable accommodations. After an employee makes an accommodation request, "both parties have an obligation to proceed in a reasonably interactive manner" and to engage in "good-faith communications" to identify a reasonable accommodation. Midland Brake, 180 F.3d at 1172; see also Bartee v. Michelin N. Am., Inc., 374 F.3d 906, 916 (10th Cir. 2004) (employer's failure to participate in interactive process supported failure-to-accommodate claim). Yet the record shows that PPI delayed and failed to respond to Yinger's request for additional leave. According to Yinger, Pulliam told him on March 11 that they would discuss the leave request when the time came but never initiated any further communications. This is consistent with Pulliam's own statement that PPI "took no stance, nor made any response" when Yinger asked if they would allow him to return to work if he could not meet his original return-to-work date. Finally, despite Pulliam's testimony that he would have granted Yinger

10

up to a year of leave "to the benefit of the company," he never offered Yinger this alternative accommodation. Rather than engage in an interactive process with Yinger, Pulliam appears to have done just the opposite, expressly telling PPI's human resources professional to stay silent and communicate nothing to Yinger regarding his leave request.[4]

### 3

PPI asserts—and the district court agreed—that reinstating Yinger after the expiration of his leave period would have constituted an undue hardship. The ADA defines "undue hardship" as "an action requiring significant difficulty or expense." 42 U.S.C. § 12111(10)(A).[5] PPI presented evidence that it lost its two biggest customers in March and early April 2013, was unable to obtain emergency financing, and needed to reduce employee costs. There was also testimony from Yinger's supervisor that his department was overstaffed and that Yinger was his least valuable employee.

At the same time, PPI has given inconsistent and contradictory explanations for why Yinger is no longer employed at the company. In connection with Yinger's

---

[4] PPI argues that it was Yinger who failed to continue discussions regarding his need for accommodations. As the record and foregoing analysis demonstrate, however, this is, at the very least, a disputed issue of fact.

[5] Specific factors to be considered include: "(i) the nature and cost of the accommodation needed . . . ; (ii) the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; . . . (iii) the overall financial resources of the covered entity; . . . and (iv) the type of operation or operations of the covered entity." § 12111(10)(B).

11

application for unemployment benefits, Pulliam denied any role in Yinger's termination, stating that "[Yinger] left at no cause of [PPI], on his own, with only short notice, for medical reasons related to his longstanding heart problems." He further asserted that "[PPI] was never in a position of being unable to hold the job until [Yinger] could return . . . as there was never any consideration to holding [Yinger's] job." After Yinger filed the instant lawsuit, however, Pulliam shifted his explanations. He testified he had accommodated Yinger's one-week leave request and was prepared to meet with Yinger on April 23; it was only after Yinger left without making any contact that Pulliam concluded Yinger had decided to leave the company. When asked if he would have given Yinger his job back had Yinger not walked away, Pulliam responded that he could have "hung on and kept [Yinger]" despite the company's impending financial collapse, but that Yinger "made the choice to send [him] unemployment separation papers" instead.[6] Nicholes similarly testified that the company "had no intention of not letting [Yinger] come back on [April 17]," and that he was terminated only because he failed to show up for work following the expiration of his FMLA leave.

PPI's shifting and inconsistent explanations for not holding open Yinger's job create a genuine issue of fact as to PPI's undue hardship defense. See Midland

---

[6] The district court interpreted Pulliam's statement as suggesting only that PPI would have let Yinger remain on unpaid leave. But Pulliam does not say that he was only willing to give Yinger unpaid leave. Moreover, he was answering a question about whether Yinger could have had his job back on April 23. Properly interpreted in the light most favorable to Yinger, Pulliam's statement indicates that PPI would have allowed Yinger to return to work on April 23.

Brake, 180 F.3d at 1179 (stating summary judgment should be denied if plaintiff establishes genuine dispute as to employer's affirmative defense); see also C.R. Eng., 644 F.3d at 1038-39 (holding that pretext for ADA discrimination can be shown if proffered reasons for employment action are "so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude they are unworthy of belief" (brackets and quotation omitted)). Because Yinger has demonstrated multiple issues of material fact in regard to his ADA claim, the district court erred in granting summary judgment.

**B**

Yinger also challenges the district court's grant of summary judgment on his retaliatory discharge claim. To establish a prima facie case of retaliatory discharge under Kansas law, a plaintiff must generally show that "(1) [he] exercised a statutory . . . right recognized as a basis for a retaliatory discharge claim; (2) the employer had knowledge of [his] exercise of that right; (3) the employer terminated [his] employment; and (4) a causal connection existed between the protected activity and the termination." Lumry v. State, 307 P.3d 232, 249 (Kan. Ct. App. 2013), rev'd on other grounds, 385 P.3d 479, 490 (Kan. 2016) (impliedly adopting same elements of prima facie retaliatory discharge claim).

Kansas recognizes the tort of retaliatory discharge for reporting OSHA violations. Flenker v. Willamette Indus., Inc., 967 P.2d 295, 297, 300-03 (Kan. 1998). Kansas courts have further held that a retaliatory discharge claim "will lie if the employer believed the plaintiff was the source of reported protected

13

comments" and discharged him for that reason, even if the plaintiff did not actually engage in the protected activity. See Larson v. Ruskowitz, 850 P.2d 253, 261 (Kan. 1993).

The district court in this case held that Yinger failed to show a causal connection between the July 2012 OSHA inspection and PPI's April 2013 decision not to return Yinger to work following his FMLA leave.[7] It concluded specifically that the nine-month time lapse could not give rise to any inference of causation. Although "[p]roximity in time between the [protected activity] and discharge is a typical beginning point for proof of a causal connection," it "is not the sole means" of establishing that element of a retaliatory discharge claim. Rebarchek v. Farmers Coop. Elevator, 35 P.3d 892, 899 (Kan. 2001). Causation may also be demonstrated by a pattern of retaliatory conduct leading to the termination. Id. If "the pattern of retaliatory conduct begins soon after the [protected activity] and only culminates later in actual discharge," it is especially important that temporal proximity not "be read too restrictively." Marx v. Schnuck Mkts., Inc., 76 F.3d 324, 329 (10th Cir. 1996) (analyzing federal retaliation claim).

Viewing the evidence in the light most favorable to Yinger, a reasonable jury could conclude that PPI engaged in a pattern of retaliatory conduct following the July

_____

[7] PPI argues Yinger "conceded there [was] no relationship" between the OSHA inspection and his termination. But this overstates Yinger's testimony. Although Yinger said at the outset of his deposition that his termination was based on disability and had "nothing to do with OSHA," he later clarified that he believed the OSHA investigation "had a lot of [e]ffect on [Pulliam's] decision not to bring [him] back."

14

2012 OSHA inspection, culminating in Yinger's termination. Pulliam's memos, posted in PPI's breakroom following the inspection, provide the most obvious support for such a conclusion. In them, he informed all employees that he had never wanted to hire Yinger, that PPI would be outsourcing all building maintenance work (which had comprised a portion of Yinger's job duties), and that there was a "worm" working for PPI who had trumped up an OSHA charge in order to harm the company. A reasonable jury could conclude that these actions were retaliatory. Cf. Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ., 595 F.3d 1126, 1133 (10th Cir. 2010) (stating that "[a]cts that carry a significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects may be considered adverse actions" for purposes of a federal retaliation claim (quotation omitted)).

The district court observed that PPI treated Yinger favorably during the nine-month period following the OSHA inspection because it granted Yinger's FMLA leave request and effectively allowed him a one-week extension of that leave. The court further reasoned that Yinger's employment was only terminated after the company began experiencing financial and overstaffing difficulties. But granting Yinger's FMLA leave was PPI's statutory obligation. And, as explained above, there are genuine issues of material fact as to both PPI's accommodation of Yinger's extension request and its reasons for not allowing Yinger to return to work. There is also evidence that PPI treated Yinger unfavorably after the July memos. Pulliam was cold to Yinger following the OSHA inspection. In addition, PPI failed to respond to Yinger's ADA accommodation request, Pulliam told Nicholes to stay silent if Yinger

15

showed up or asked any questions after his FMLA leave, and Pulliam refused to put anything in writing regarding Yinger's termination, claiming instead that Yinger voluntarily ended his employment. Based on this evidence, a reasonable jury could conclude that PPI retaliated against Yinger as soon as the opportunity presented itself—after Yinger's FMLA leave expired in April 2013.

## III

For the foregoing reasons, we **REVERSE** the district court's grant of summary judgment on Yinger's ADA and retaliatory discharge claims and **REMAND** the case for further proceedings. We also **GRANT** the parties' motions to seal Volumes II and III of the Appellant's Appendix. JetAway Aviation, LLC v. Bd. of Cty. Comm'rs, 754 F.3d 824, 826 (10th Cir. 2014) (holding that court may seal documents if public's right of access is outweighed by competing interests). These records were subject to a protective order in the district court because they contain confidential financial information about PPI. We are therefore satisfied that the parties have presented "a real and substantial interest that justifies depriving the public of access to the records." Id. (quotation omitted).

Entered for the Court

Carlos F. Lucero
Circuit Judge

16